REVISED August 13, 2007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 31, 2007

Charles R. Fulbruge III
Clerk

———————

No. 05-30666

———————

UNITED STATES OF AMERICA

Plaintiff - Appellant - Cross-Appellee

v.

BARNEY DEWEY RATCLIFF, JR

Defendant - Appellee - Cross-Appellant

———————————————————————————————

Appeal from the United States District Court
for the Middle District of Louisiana, Baton Rouge

———————————————————————————————

Before KING, GARZA, and PRADO, Circuit Judges.

KING, Circuit Judge:

Defendant-appellee-cross-appellant Barney Dewey Ratcliff,
Jr. was charged by indictment with fourteen counts of mail fraud,
in violation of 18 U.S.C. § 1341, based on alleged activities
involving election fraud in Louisiana.  The district court
granted Ratcliff's motion to dismiss the counts, concluding that
the indictment did not allege a scheme to defraud anyone of money
or property, thereby failing to state the offense of mail fraud
under § 1341.  The United States now appeals, arguing that a
scheme to obtain the salary and employment benefits of elected

1

office through election fraud satisfies the requirements of the mail fraud statute.  We AFFIRM.[1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Livingston Parish, Louisiana, operates under a home rule charter providing that its citizens elect a parish president for a four-year term.  See LA. CONST. art. VI, § 5; LIVINGSTON PARISH HOME RULE CHARTER § 3-02.  In 1999, Ratcliff was the incumbent Livingston Parish president and a candidate for reelection.

Candidates for public office in Louisiana must abide by the provisions of Louisiana's Campaign Finance Disclosure Act ("CFDA"), LA. REV. STAT. ANN. §§ 18:1481-:1532.  The CFDA prohibits any candidate for parishwide elective office, including the parish presidency, from receiving contributions, loans, or loan guarantees in excess of $2500 from any individual.  Id. §§ 18:1483(7)(b), :1505.2(H).  Candidates must also file campaign finance disclosure reports with the Louisiana Board of Ethics (the "Board" or "Board of Ethics").  Id. § 18:1484.  The reports are to detail all campaign contributions, loans, loan guarantors, and expenditures.  Id. § 18:1495.5.

According to the indictment, Ratcliff obtained several loans violative of the CFDA from September to November 1999.  On September 23, 1999, Ratcliff obtained a $50,000 bank loan for the

---

[1] Because we affirm the dismissal of Ratcliff's indictment, we do not address his cross-appeal, as it is moot.

purpose of financing his reelection campaign.  Ratcliff had insufficient income and assets to qualify for the loan, and a local businessman with sufficient assets served as cosigner.  One week later, on October 7, Ratcliff obtained another $50,000 loan with the same businessman as cosigner.  The cosigner also assigned a $50,000 certificate of deposit as collateral.

On October 12, Ratcliff filed with the Board of Ethics a campaign finance disclosure report in which he disclosed the first loan and the businessman's guarantee of that loan.  On October 19, a staff member of the Board advised Ratcliff that the businessman's guarantee possibly violated the CFDA.  In response, Ratcliff informed the Board that he had instructed the bank to prepare new loan documents for his signature alone.

On October 22, Ratcliff obtained two new loans to pay off the loans that had been improperly guaranteed by the businessman. The indictment charges that the new loans were secured by a pledge of $99,000 in cash, supplied by one of Ratcliff's wealthy supporters who had a financial interest in the transfer of a permit for operation of a landfill in Livingston Parish to Waste Management, Inc. ("Waste Management").  The transfer, which was allegedly supported by Ratcliff, was a major election issue. Ratcliff obtained another $50,000 loan on November 3, allegedly secured by a pledge of $55,000 in cash supplied by the same wealthy supporter.  The indictment asserts that Ratcliff knew that his receipt of the cash for all three loans violated the

3

$2500 individual loan limitation and that he did not report it in his campaign finance disclosure reports.

Ratcliff was reelected as parish president on November 20. During the course of the campaign, Ratcliff had contracted with a political consultant to help with his reelection bid, and by the time of the election, Ratcliff owed the consultant over $57,000. On November 22, a Waste Management lobbyist allegedly gave Ratcliff approximately $44,000 in cash for Ratcliff's political consultant to hold as collateral until Ratcliff paid the consultant the money owed. The indictment alleges that Ratcliff knew that his use of the cash to secure a campaign debt violated the $2500 statutory limitation and that Ratcliff did not disclose the illegal loan in his campaign finance disclosure reports.

In addition to Ratcliff's failure to report the amount and source of certain cash and loans he received, he allegedly misled the Board of Ethics during its investigation of his activities. Specifically, the indictment alleges that Ratcliff falsely represented that he had the creditworthiness to obtain the original loans on September 23 and October 7, 1999, without a cosigner and that the replacement loans were obtained on the basis of his independent creditworthiness. And despite requests from the Board for information on his use of collateral to secure the replacement loans, Ratcliff allegedly failed to disclose that the collateral was borrowed cash. The indictment also asserts that Ratcliff used the mails to submit a campaign finance

4

disclosure report and two letters concerning the ethics investigation to the Board of Ethics, as well as to receive the financial benefits of office.

After Ratcliff's reelection as parish president, Ratcliff served in office from January 10, 2000, to January 12, 2004. During this term, Ratcliff allegedly received over $300,000 in salary and employment benefits from the parish.

On November 3, 2004, Ratcliff was charged by indictment with fourteen counts of mail fraud and one count of making a false statement to a financial institution.[2]  With regard to the mail fraud counts, the Government alleged that Ratcliff used the mails in a scheme to defraud Livingston Parish of the salary and employment benefits of elected office through misrepresentations he made to the Board of Ethics concerning the financing of his campaign.  According to the Government, Ratcliff secured his reelection as parish president by obtaining the illegal funding and concealing his violations from the Board of Ethics.

On March 1, 2005, Ratcliff filed a motion to dismiss the mail fraud counts.  After hearing oral argument on the motion, the district court granted the motion on May 23.  The Government appealed.

## II.  DISCUSSION

[2] The count involving a false statement to a financial institution is not at issue in this appeal.

The Government contends that Ratcliff's indictment sufficiently charged the offense of mail fraud because the salary and employment benefits of elected office constitute "money or property" under the mail fraud statute and because fraudulent job procurement can constitute mail fraud in the election context just as it can in the typical hiring context.  Ratcliff counters that any misrepresentations he allegedly made to the Board of Ethics, which is a state entity, were unrelated to the salary and benefits paid as a matter of course by Livingston Parish, which is a distinct, local entity.

We review the sufficiency of an indictment de novo, taking the indictment's allegations as true.  United States v. Crow, 164 F.3d 229, 234 (5th Cir. 1999).  The Federal Rules of Criminal Procedure require that the indictment be "a plain, concise and definite written statement of the essential facts constituting the offense charged."  FED. R. CRIM. P. 7(c)(1).  The indictment is sufficient if it "alleges every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." United States v. Bieganowski, 313 F.3d 264, 285 (5th Cir. 2002) (citation and internal quotation marks omitted).  When reviewing the indictment, we must keep in mind that "the law does not compel a ritual of words" and that an indictment's validity depends on practical, not technical, considerations.  Crow, 164 F.3d at 235 (quoting United States v.

Devoll, 39 F.3d 575, 579 (5th Cir. 1994)). And "[t]he starting place for any determination of whether the charged conduct [is] proscribed by [a criminal] statute is a reading of the language of the charging instrument and the statute itself." United States v. White, 258 F.3d 374, 381 (5th Cir. 2001) (second and third alterations in original) (quoting United States v. Morales-Rosales, 838 F.2d 1359, 1361 (5th Cir. 1988)).

To sufficiently charge the offense of mail fraud,[3] the

_____

[3] The mail fraud statute provides in full:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the

7

indictment must allege that (1) the defendant devised or intended to devise a scheme to defraud, (2) the mails were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material.[4]  United

> Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341.

[4] While specific intent is also an essential element of mail fraud, it need not be specifically charged in the indictment. Caldwell, 302 F.3d at 409 n.8.  Additionally, materiality need not be specifically charged "if the facts alleged in the

8

States v. Caldwell, 302 F.3d 399, 409 (5th Cir. 2002). The first element includes a defendant's scheme or artifice (1) "to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, (2) "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,"[5] 18 U.S.C. § 1341, or (3) "to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious . . . article," 18 U.S.C. § 1341. See Caldwell, 302 F.3d at 406. Only the second type of scheme or artifice is at issue in this appeal, as Ratcliff was charged with

indictment warrant an inference of materiality." Id. at 409 (internal quotation marks, alteration marks, and citations omitted).

[5] Although the mail fraud statute's proscription of certain schemes "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" could be construed independently of the statute's proscription of "any scheme or artifice to defraud," 18 U.S.C. § 1341, the Supreme Court has held that the phrases are to be read together and that the phrase discussing money or property "simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." McNally v. United States, 483 U.S. 350, 358-59 (1987).

a scheme to defraud Livingston Parish of the money and property represented by "the powers, privileges, salary, and other benefits" of his elected office.

We do not dispute the Government's contention that a salary and other financial employment benefits can constitute "money or property" under the statute; as the Eighth Circuit put it when discussing a scheme to defraud an employer of wages, "[m]oney is money, and 'money' is specifically mentioned in the statutory words." United States v. Granberry, 908 F.2d 278, 280 (8th Cir. 1990) (emphasis omitted); see also Pasquantino v. United States, 544 U.S. 349, 356-57 (2005) (recognizing that money in the public treasury is the government's "money" for purposes of the mail fraud statute). But the real question before us is whether the indictment alleges a scheme to defraud the alleged victim——Livingston Parish——of that money.[6] See United States v. Rico Indus., Inc., 854 F.2d 710, 713 (5th Cir. 1988) ("The mail fraud statute protects only against schemes or artifices to defraud the property rights of citizens."). As the Supreme Court has explained, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of

_____

[6] The indictment does not allege that Ratcliff devised a scheme to defraud the Board of Ethics, the state, or any other party besides Livingston Parish of money or property.

10

value by trick, deceit, chicane, or overreaching.'" McNally v. United States, 483 U.S. 350, 359 (1987) (quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)). Accordingly, in determining whether the indictment alleges a scheme to defraud Livingston Parish of money or property, we must look to whether the alleged scheme is one to deprive the parish of money or property through misrepresentations, thereby wronging the parish's property rights.[7] See id. at 360 (holding that the mail fraud statute is "limited in scope to the protection of property rights"); see also Cleveland v. United States, 531 U.S. 12, 19 (2000) (recognizing the Court's "[r]eject[ion of] the argument that 'the money-or-property requirement . . . does not limit schemes to defraud to those aimed at causing deprivation of money or property'"); Carpenter v. United States, 484 U.S. 19, 27 (1987) ("Sections 1341 and 1343 reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.").[8]

---

[7] Of course, the mail fraud statute does not require a completed fraud, just that the defendant has "devised or intend[ed] to devise" a scheme to defraud. 18 U.S.C. § 1341; Neder v. United States, 527 U.S. 1, 25 (1999).

[8] The Government defines the words "to deprive" as merely meaning "to take something away from." However, the cases cited above illustrate that the deprivation must involve a wronging of

11

Applying these principles, it is evident that Ratcliff's indictment does not allege a scheme to defraud Livingston Parish of any money or property. According to the indictment, Ratcliff devised a scheme (1) to conceal campaign finance violations from the Board of Ethics, which would (2) deceive the voting public about the campaign contributions he received, which would (3) secure his reelection to office, which would (4) cause Livingston Parish to pay him the salary and other financial benefits budgeted for the parish president. Although the charged scheme involves Ratcliff ultimately receiving money from the parish, it cannot be said that the parish would be deprived of this money by means of Ratcliff's misrepresentations, as the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is. Nor would the parish be deprived of its control over the money by means of Ratcliff's fraud, as the parish has no such control other than ensuring that the benefits are paid to the duly elected candidate. There are no allegations, for example, that the parish was deceived into paying the parish president's salary to someone who did not win the election or to someone who failed to meet the parish's minimum requirements for office.[9] Indeed, there are no

the victim's property rights.

[9] We express no opinion on these situations, as they are not before us in this appeal.

allegations that the parish would be deceived, either directly or indirectly, into taking any action at all; rather, the indictment alleges a scheme to deceive the Board of Ethics and the voters. Though the misrepresentations in a mail fraud scheme need not be made directly to the scheme's victim, see, e.g., United States v. Pepper, 51 F.3d 469, 473 (5th Cir. 1995), the alleged scheme must nevertheless be one to defraud the victim. Ratcliff's indictment provides no basis to find a scheme to defraud Livingston Parish through misrepresentations made to the Board of Ethics. The misrepresentations simply did not implicate the parish's property rights.

The Sixth Circuit recently reached a similar result in United States v. Turner, 465 F.3d 667 (6th Cir. 2006). In that case, Turner was indicted on charges that, inter alia, he engaged in a scheme to violate state campaign finance laws and to mail false campaign finance reports to the state in order to cover up the violations, thereby assisting the election of two state officials who received salaries from the state while in office. Id. at 670. The Sixth Circuit surveyed the case law and concluded that "applying the mail fraud statute to a case of election fraud based on a theory that the candidate attempted to obtain money in the form of a salary would be a novel application of the mail fraud statute." Id. at 678. Looking to the merits of the theory, the court determined that in the election fraud context, "the government and citizens have not been deprived of

13

any money or property because the relevant salary would be paid to someone regardless of the fraud.  In such a case, the citizens have simply lost the intangible right to elect the official who will receive the salary."  Id. at 680.  The court further decided that the allegedly defrauded state had "no control over the appropriation of the salary beyond ensuring payment to the duly elected official," and that "[a]lthough the salary comes from the public fisc, there is no discretion regarding either whether or to whom it is paid."  Id. at 682.  Accordingly, the court concluded that "there is no resulting property deprivation" from the alleged scheme.  Id.

     The Government makes several arguments seeking to avoid this conclusion here.  First, the Government contends that several courts in other circuits have embraced the so-called "salary theory," under which a mail fraud charge can be supported by a scheme to use deceit to obtain a job and the salary that comes with it.  Yet even if the salary theory were to be accepted in this circuit, the cases discussing and accepting the theory involve situations in which a job applicant falsely represented his qualifications or skills in order to obtain a job, deceiving the employer into hiring or promoting someone that he would not have otherwise hired or promoted.[10]  In United States v.

_____

     [10] The Government contends that three circuit court cases approve of the salary theory in an election fraud context, but

14

none of the cases provides any analysis of the issue. In <u>United States v. Walker</u>, the defendant was convicted of mail fraud for his involvement in a scheme to ensure the reelection of a candidate for office, and the alleged objects of the scheme were to deprive the people of his city and state of both the salary of office and the intangible right to honest services. 97 F.3d 253, 255 (8th Cir. 1996). The only issue addressed by the Eighth Circuit that involved the defendant's scheme was whether the jury instructions properly required the jury to unanimously agree on the object of the scheme. <u>Id.</u> The Government points to a footnote in which the court listed several other claims that it found meritless, including the claim that the district court erred by "not dismissing the indictment." <u>Id.</u> at 256 n.2. Although the Government assures us that its brief in the case raised the salary theory to the court, the <u>Walker</u> footnote's summary disposal of the claim bears no reference to the theory or the grounds on which the court based its ruling.

The defendant in <u>United States v. Schermerhorn</u> was acquitted of mail fraud charges that alleged a scheme to conceal illegal campaign contributions in order to defraud the state and its taxpayers of the salary and benefits he would receive in office. 906 F.2d 66, 68 (2d Cir. 1990); <u>United States v. Schermerhorn</u>, 713 F. Supp. 88, 88-89 (S.D.N.Y. 1989). The defendant argued in his appeal that the district court should have dismissed the mail

15

_Granberry_, for example, the defendant obtained the job of school-bus driver by concealing a murder conviction, which would have prevented his hiring if known to the school district.  908 F.2d

---

fraud counts before the trial and that the evidence introduced to the jury in conjunction with the counts prejudiced the jury against him on other charges of which he was convicted. _Schermerhorn_, 906 F.2d at 69.  The Second Circuit disagreed, stating only that the district court did not abuse its discretion in denying the motion to dismiss the mail fraud counts "[b]ecause the mail fraud indictment stated a claim under the mail fraud statute as interpreted in _McNally_."  _Id._  The opinion contains no discussion of the court's reasoning or the defendant's arguments to the court.

The Second Circuit's earlier decision in _Ingber v. Enzor_, 841 F.2d 450 (2d Cir. 1988), also involved a mail fraud conviction in an election fraud context, but only addressed the retroactivity of the Supreme Court's holding in _McNally_.  As the Government concedes, the court did not explicitly address the salary theory, and even if the case could be read as implicitly approving of the theory, the opinion contains no analysis of the issue.

As none of these cases contains any reasoning relevant to the issues presented in this appeal, we do not find them persuasive.

16

at 279.  The Eighth Circuit reversed the district court's dismissal of the indictment, holding that the defendant's alleged scheme deprived the school district of money because the district did not get what it paid for——a school-bus driver who had not been convicted of a felony.  Id. at 280.  The court also concluded that the scheme deprived the school district of the property right to choose the person to whom it transferred money. Id.  Similarly, the defendants in United States v. Doherty were Boston policemen who schemed to steal copies of civil service examinations and sell them to other policemen so that they could cheat and obtain promotions.  867 F.2d 47, 51 (1st Cir. 1989). The First Circuit held that such a scheme fell within the prohibition of the mail fraud statute because it deprived the employer "of control over how its money was spent."  Id. at 60 (quoting McNally, 483 U.S. at 360).  Unlike these situations, Ratcliff's charged conduct posed no harm to any of Livingston Parish's property rights:  the parish does not bargain for elected officials of a particular quality such that Ratcliff's fraud could have denied it the value for which it paid, and the parish does not have control over the recipient of the parish president's salary such that Ratcliff's misrepresentations deprived it of that control.  As the Sixth Circuit summarized when distinguishing these cases, "these examples, which address the government's role as employer, where job qualifications can be economically quantified, are not analogous to an election

17

fraud case, where the government's role is purely administrative and the public's role is a political one."  Turner, 465 F.3d at 682.

Responding to these distinctions, the Government contends that if a job procurement theory can successfully support a charge of mail fraud when a government employer is making the hiring decision itself, the result should not change merely because the parish has effectively delegated its hiring decision to the electorate.  We disagree, however, with the notion that the electoral process constitutes an effective delegation of hiring authority from the parish government to the voters.  The power to select the parish president does not originate from the parish government, but rather is vested in the electorate under the Louisiana Constitution and Livingston Parish's Home Rule Charter.  See LA. CONST. art. 6, § 11 ("The electors of each local governmental subdivision shall have the exclusive right to elect their governing authority."); LIVINGSTON PARISH HOME RULE CHARTER § 3-02 ("The president shall be elected at large by the qualified voters of the parish according to the election laws of the state for a four (4) year term.").  Although the parish government is obligated to pay whichever candidate the voters elect, it has no discretion in the matter; its role is purely administrative, "implicat[ing] the [g]overnment's role as sovereign, not as property holder."  Cleveland, 531 U.S. at 23-24; Turner, 465 F.3d at 682.  There is thus no basis to view the electorate as an

18

agent of the government such that false statements influencing the voters could be viewed as a fraud on the parish.

Finally, the Government contends that the scheme alleged in this case is no different than fraudulent contract procurement schemes, in that courts have allowed mail fraud charges to be brought in such situations without any actual financial loss to the victim. But the cases cited by the Government do not address the scope of the mail fraud statute, instead discussing whether fraudulently procured contracts can cause a financial loss to the victim for sentencing purposes if the contracts were properly performed by the perpetrator of the fraud. See United States v. Sublett, 124 F.3d 693, 695 (5th Cir. 1997); see also United States v. Pendergraph, 388 F.3d 109, 113-14 (4th Cir. 2004); United States v. Schneider, 930 F.2d 555, 558 (7th Cir. 1991). Moreover, the cases only discuss loss in "a narrow financial sense," Schneider, 930 F.2d at 558, and one of the cases recognized that fraud through "nonmonetizable losses" exists where a contractor imposes a risk of loss on his employer by misrepresenting that he meets the qualifications required by his employer or otherwise fraudulently denies the employer of value for which he contracted, see id. We have not suggested that a mail fraud scheme must actually cause a financial loss to the victim, merely that a scheme to defraud a victim of money or property, if successful, must wrong the victim's property rights in some way. See McNally, 483 U.S. at 358-59. Unlike fraudulent

19

contract procurement schemes in which the employer is deprived of value for which it contracted or control over its money, the scheme alleged in the indictment implicates none of Livingston Parish's property rights.

Our analysis in this appeal also takes into account federalism concerns, and on this front we are informed by the Supreme Court's decision in Cleveland v. United States, 531 U.S. 12 (2000). The defendant in Cleveland was charged with mail fraud for obtaining a license to operate video poker machines by means of false statements to a state licensing board. The Court held that such a license does not constitute "property" in the hands of the deceived state, as it is without value before being issued, and therefore cannot support a charge of mail fraud. See id. at 22-23. The Court further recognized that the state's core concern in issuing video poker licenses is regulatory rather than proprietary and that accepting the indictment's theory of mail fraud would broadly expand federal criminal jurisdiction to cover a wide range of conduct that has traditionally been regulated by state and local governments, which the Court declined to do in the absence of a clear statement by Congress. Id. at 20-21, 24-25.

In construing the meaning of the terms of the mail fraud statute, we are similarly guided by the principle that "'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the

prosecution of crimes." Jones v. United States, 529 U.S. 848, 858 (2000) (quoting United States v. Bass, 404 U.S. 336, 349 (1971)). Like the poker licensing system at issue in Cleveland, Louisiana law establishes a comprehensive regulatory system governing campaign contributions and finance disclosures for state and local elections, with state civil and criminal penalties in place for making misrepresentations on campaign finance disclosure reports. LA. REV. STAT. ANN. §§ 18:1505.4-:1505.6. And like the Court in Cleveland, "[w]e resist the Government's reading of § 1341 . . . because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." 531 U.S. at 24. Finding a scheme to defraud a governmental entity of the salary of elected office based on misrepresentations made during a campaign would "subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." Id. In practice, the Government's theory in this case would extend far beyond the context of campaign finance disclosures to any misrepresentations that seek to influence the voters in order to gain office, bringing state election fraud fully within the province of the federal fraud statutes. The mail fraud statute does not evince any clear statement conveying such a purpose, and the terms of the statute, as interpreted by Supreme Court precedent, simply do not proscribe the conduct for which Ratcliff was indicted. See Turner, 465 F.3d at 683.

21

## III. CONCLUSION

For the foregoing reasons, we AFFIRM.