# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 2, 2012

No. 11-40643

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ROBERT EARL READ; CLAUDETTE READ,

Defendants-Appellants

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 1:09-CR-40-2

Before KING, SMITH, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Defendants-Appellants Robert Earl Read and Claudette Read were convicted on one count of conspiracy to commit health care fraud and twenty counts of mail fraud. They appeal their convictions, sentences, and restitution orders. For the reasons that follow, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The grand jury charged Defendants-Appellants Claudette Read and her husband, Robert Earl Read, with mail fraud, health care fraud, and conspiracy

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 11-40643

to commit health care fraud, alleging that the Reads had submitted fraudulent Medicare, Medicaid, and Blue Cross Blue Shield ("BCBS") claims through their ambulance business. The grand jury later returned a superseding indictment, charging the Reads with one count of conspiracy to commit health care fraud, thirty-two counts of health care fraud and aiding and abetting, forty-two counts of mail fraud and aiding and abetting, and eight counts of aggravated identity theft and aiding and abetting. 18 U.S.C. §§ 2, 371, 1028A, 1341, 1347. The superseding indictment included a criminal forfeiture notice as to the alleged gross proceeds from the charged fraudulent scheme. *Id.* § 982(a)(1), (a)(7).

The Reads owned Priority One—a Jasper, Texas-based company that provided, *inter alia*, non-emergency ambulance transport services to dialysis patients. The government alleged that between 2004 and 2007, the Reads fraudulently represented to Medicare, Medicaid, and BCBS that patients Priority One had taken to dialysis appointments required ambulance transport.

At trial, several witnesses testified as to Medicare, Medicaid, and BCBS reimbursement policies. Medicare covers non-emergency ambulance transport if a "medical necessity" exists: (1) The beneficiary is bed-confined, and his or her medical condition precludes other means of transport; or (2) the beneficiary's medical condition, regardless of bed confinement, necessitates ambulance transport. 42 C.F.R. § 410.40(d)(1). A beneficiary is "bed-confined" if he or she cannot get up from bed without assistance, is unable to walk, or is unable to sit in a chair or wheelchair. *Id.* Patients who can sit in a wheelchair can travel by car or wheelchair van unless their medical condition requires ambulance transport. If Medicare pays a "crossover claim," Medicaid automatically pays the Medicare co-pay and deductible. BCBS's reimbursement policies are based on Medicare's policies. If Medicare pays or rejects a claim, BCBS "follow[s] suit."

Medicare covers non-emergency, scheduled, repetitive ambulance transport—the type of transport at issue here—if the ambulance provider

2

No. 11-40643

obtains a certificate of medical necessity ("CMN") from the beneficiary's physician. *Id.* § 410.40(d)(2). A CMN provides certification that the "medical necessity" requirement has been satisfied, and must be no older than sixty days at the time of transport. *Id.* A CMN does not permit reimbursement for an ambulance run that is not medically necessary. *Id.* If a provider submits a claim that includes any non-covered service, the provider must indicate this by including a specified code on the claim form. The provider must also inform Medicare of "double transports" because, although Medicare covers eighty percent of the ambulance charge for a patient being transported singly, it covers only seventy-five percent of each ambulance charge for two patients being transported together. If a trip is a "courtesy transport" for which reimbursement is not sought, this must be indicated on the claim form.

The jury found the Reads guilty on the conspiracy charge and twenty of the mail fraud charges. The mail fraud convictions involved fraud on Medicare and Medicaid, but not BCBS, and related to only four of the fifteen patients identified in the superseding indictment: Cleveland L. Casey, Mattie Lewis, Patsy R. Hogg, and Mary A. Pool. At the nine-day trial, the government offered evidence and testimony respecting Priority One's general business practices, as well as its practices as to specific patients.

Tina Welch, a Medicare claims processor employee, testified as to Medicare regulations governing ambulance service providers, including the requirement not knowingly or recklessly to submit false claims. The government offered into evidence Priority One's Medicare provider application form, by which Claudette Read certified on Priority One's behalf that it would abide by Medicare laws and regulations. Welch and others testified that government health care programs rely on service providers to submit truthful claims because these programs do not have the resources to verify every claim.

3

No. 11-40643

Former Priority One emergency medical technicians (EMTs) testified that they were required to fill out "run sheets"—forms submitted to Medicare that provide information on ambulance transportees. Claudette Read instructed the EMTs to omit certain information from the run sheets, including whether transportees could sit in a wheelchair or walk, and she returned to EMTs any run sheet that included the word "wheelchair" so that it could be rewritten. Multiple supervisors in Priority One directed EMTs to omit information that would cause Medicare to deny payment. After Robert Read took over one supervisor's responsibilities, he did not instruct EMTs to change how they completed run sheets. At one point, Robert Read told an EMT that "it did not matter how [a patient] got to the stretcher [(e.g., walking, in a wheelchair, or carried)]. . . . Medicare didn't care." Two witnesses testified that Claudette had learned at a seminar that any claim that included the word "wheelchair" would not be paid. The EMTs routinely picked up patients who could walk or use wheelchairs.

Although many EMTs admitted on cross-examination that, as non-doctors, they could not assess with absolute certainty whether a patient had a "medical necessity" for ambulance transport, doctors and nurses of Priority One patients testified that no medical necessity existed as to these patients. One EMT testified that she noticed run sheets were being altered to include "the right check boxes," instead of attachments being appended to them. Further, the Reads had doctors pre-sign CMNs that Priority One employees later filled out.

The government offered evidence and testimony as to the four dialysis patients involved in the substantive counts of conviction. Although Patsy Hogg and Mary Pool were transported together 537 times, each of these runs was billed as two "single transports." Cleveland Casey and Mattie Lewis were transported together on thirty-nine runs, which were also billed as single transports. Run sheets showed that Robert Read drove the ambulance on six of

4

No. 11-40643

Hogg and Pool's double transports. The government further presented evidence that, regardless of single or double transporting, none of these four patients qualified for ambulance reimbursement.

Mattie Lewis did not require a wheelchair, and routinely rode in the front seat of the ambulance transporting her. Before Priority One began transporting her, she was taken to dialysis appointments in the dialysis center's van. Although there was some concern that Lewis required an ambulance because she suffered from dementia and had become violent on previous occasions, she took medication for this condition, and Priority One EMTs uniformly testified that she had never presented any difficulties in this regard. Indeed, several months after Priority One began to transport her, EMTs were directed to move her from the back of their ambulances to the front seat. The employee who evaluated Lewis so that Robert Read could decide whether to transport her testified that aggression was not his concern. Rather, his only concern was having someone present to help her in moments of confusion. On occasion, Robert Read even called on this employee to take her to appointments in a personal vehicle.

Cleveland Casey was paralyzed on his left side, but could nonetheless propel himself in a wheelchair. His nursing home took him to dialysis appointments in a wheelchair van before Priority One began transporting him. Further, several EMTs testified that Casey could have been transported by wheelchair van using an upper-body restraint to keep him secure. When Robert Read asked an employee to transport Casey in a personal vehicle, an attendant sat next to him to ensure that he stayed upright.

Like Mattie Lewis, Mary Pool often rode in the front of Priority One ambulances. She also used a wheelchair, and had been transported by wheelchair van in the past. EMTs and Pool's nurse testified that she could have ridden in a wheelchair van.

5

No. 11-40643

Patsy Hogg was also in a wheelchair when EMTs picked her up. Her doctor testified that she did not normally meet Medicare's requirements for ambulance transport, and could even walk on occasion. The government presented documentation confirming this assessment.

The government presented evidence that no claim set out in the superseding indictment—including those related to the eleven patients not involved in the substantive counts of conviction—qualified for reimbursement in the amounts billed. Department of Health and Human Services investigator Joel Dan McQueen testified that after reviewing eighty boxes of documents seized from Priority One, he determined that Priority One had omitted material information that would have prevented payment. Tina Welch examined each Medicare claim for which the Reads were charged, and testified that none of them qualified for reimbursement in the amounts billed. Texas Medicaid employee Patricia Cannizzaro testified that the Medicaid claims in the superseding indictment involved "crossover claims" that Medicaid paid automatically if approved by Medicare. BCBS investigator Marjorie Poche testified that the BCBS claims in the superseding indictment lacked material information that would have caused denial of payment.

The jury also heard testimony as to the Reads' mental states. Government investigators seized from Priority One's headquarters a book of Medicare billing regulations that had been highlighted, written in, and bookmarked. Scott Zimmerman, a senior manager at Priority One, testified that Robert Read's "main concern" with the company's office in Center, Texas, was "to make sure that it made money so that it could stay in existence." As for his management style, "it was Robert's way or the highway." When one EMT raised concerns about seeking reimbursement for Mattie Lewis's and Cleveland Casey's transports, Robert Read became "pretty upset," and told him he "could find another job." Another EMT testified that Robert Read told her it was legal to

6

transport a patient in an ambulance's front seat, even though it clearly was not. When an EMT suggested to Claudette Read that transporting one of the patients by ambulance was improper, she responded that Priority One would not be audited because the government was "after the big fish, not the little people." She also said that if Priority One overbilled, the government would permit them to pay the money back. Tina Welch testified that Priority One had received letters on three occasions stating that it had overutilized non-emergency ambulance transport for dialysis patients. The Reads did not respond to these letters.

In his defense, Robert Read testified that his subordinates had been responsible for any illegal or apparently illegal conduct at Priority One. The Reads called a former Priority One EMT who testified that the patients she transported required ambulance service, and that any "double transports" were performed as "courtesy" runs. Other former employees testified that Priority One's software would not have permitted the Reads to falsify any documents unnoticed. An expert witness's testimony implied that the Reads had complied with applicable regulations.

Although the jury found the Reads guilty on twenty-one charges, it returned no verdict on the remaining sixty-two counts. On the government's motion, the district court dismissed the hung counts. In a special verdict, the jury found by a preponderance that the forfeitable proceeds of the offenses of conviction amounted to $93,535.95.

The district court determined that the Reads' criminal history category was I, and that their offense level was 29, rendering an advisory sentencing range of 87 to 108 months. The court applied a two-level enhancement for abusing a "position of trust" under U.S.S.G. § 3B1.3, and a sixteen-level enhancement for causing an "actual loss" of $1,766,681.31 under § 2B1.1(b)(1). The court imposed on each defendant concurrent sentences of 60 months'

No. 11-40643

imprisonment for the conspiracy conviction and 108 months' imprisonment for each mail fraud conviction. The court also ordered forfeiture of $93,535.95 and restitution of $1,766,681.31. The Reads timely appealed.

## II. DISCUSSION

On appeal, the Reads argue that: (1) there was insufficient evidence to sustain their convictions; (2) the district court used the incorrect "loss" amount to calculate their advisory sentencing range; (3) the district court incorrectly determined the amount they owed in restitution; and (4) the district court incorrectly applied the "abuse of position of trust" enhancement. We disagree.

### A.     Evidentiary Sufficiency

By moving for judgments of acquittal following the government's case-in-chief and again at the close of evidence, the Reads have preserved the de novo standard of review as to their evidentiary sufficiency argument. *United States v. Frye*, 489 F.3d 201, 207 (5th Cir. 2007). "When reviewing the sufficiency of the evidence, this Court views all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict." *United States v. Moser*, 123 F.3d 813, 819 (5th Cir. 1997). "[W]e consider whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Jara-Favela*, 686 F.3d 289, 301 (5th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We do not consider whether the jury correctly determined guilt or innocence, [only] whether the jury made a rational decision." *United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005) (alteration in original) (citation omitted).

### 1.     Conspiracy

The Reads were charged with conspiring to commit health care fraud under 18 U.S.C. § 371. A conviction under § 371 requires proof beyond a reasonable doubt of: "(1) an agreement between two or more persons to pursue

an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010).

The government offered sufficient evidence to sustain the Reads' conspiracy convictions. There was ample proof of a voluntary agreement to defraud Medicare, Medicaid, and BCBS. As the sole owners of Priority One, the Reads made all important decisions relating to their business: They determined which patients' ambulance runs were billable, devised the policies governing run sheets, and told EMTs to omit material information from the run sheets. The evidence showed that the Reads knew their billing practices were illegal: They were familiar with regulations governing reimbursement, and had also been informed three times that they were overutilizing reimbursement for non-emergency ambulance transport. Finally, each satisfied the "overt act" requirement by, *inter alia*, instructing EMTs not to disclose that patients could walk or use wheelchairs.

The Reads argue that their conspiracy convictions are void because the government failed to show that their "overt acts" were independently forbidden. They incorrectly rely on *United States v. Ragsdale*, 426 F.3d 765, 778 (5th Cir. 2005), in which an independently criminal act was *sufficient* for a conspiracy conviction, not necessary. An "overt act" is "any act" in furtherance of the conspiracy's criminal objective, whether independently forbidden or not. 18 U.S.C. § 371; *United States v. El-Mezain*, 664 F.3d 467, 558 (5th Cir. 2011), *cert. denied*, 2012 U.S. LEXIS 8451 (U.S. Oct. 29, 2012) (No. 11-10437).

The Reads further argue that § 371's specific-intent requirement was not satisfied. Because the trial evidence showed that the Reads were familiar with Medicare regulations, and knew they were overutilizing non-emergency ambulance transport, the jury was permitted to find that the Reads knew their

No. 11-40643

agreement's objective was illegal. Further, the offense conduct's continuous nature supported a finding that their agreement was voluntary. *See United States v. Castillo*, 77 F.3d 1480, 1492, 1495 (5th Cir. 1996) (repeated facilitation of drug shipments sufficient to show voluntary participation in conspiracy).

### 2.    Mail Fraud

In the remaining twenty counts of conviction, the Reads were charged with mail fraud and aiding and abetting. A mail fraud conviction under 18 U.S.C. § 1341 requires proof that: "(1) the defendant devised or intended to devise a scheme to defraud, (2) the mails were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material." *United States v. Ratcliff*, 488 F.3d 639, 643–44 (5th Cir. 2007). The fraudulent scheme must have one of three objectives, which include "obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Id.* at 644 (quoting 18 U.S.C. § 1341). The government must also "prove that a defendant knew the scheme involved false representations." *United States v. Phipps*, 595 F.3d 243, 245–46 (5th Cir. 2010).

The grand jury charged the Reads with "caus[ing] requests for payments to be filed [through the mails] with Medicare [and] Medicaid . . . knowing that the claims were false because the patients did not meet the qualification for ambulance transportation." Accordingly, the government was required to prove that the Reads devised a scheme to submit claims that did not qualify for reimbursement under Medicare/Medicaid regulations.

Each element of mail fraud was satisfied here. As we have discussed, the government offered evidence that the Reads sought to obtain payment from Medicare and Medicaid by transporting non-qualifying patients. The "use of mails" element was satisfied because Medicare mailed the checks used to pay claims as to these beneficiaries. *See United States v. Ingles*, 445 F.3d 830, 835 (5th Cir. 2006) ("One 'causes' the mails to be used '[w]here one does an act with

10

knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen.'" (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954))). Finally, the Reads instructed EMTs not to disclose if patients were in wheelchairs or could walk—information the Reads knew would have caused these claims to go unpaid.

The Reads first argue that the government failed to prove that they intentionally overbilled for courtesy and double transports. The evidence showed, however, that 576 double transports were billed as single transports, and that Robert Read sometimes drove on these runs. This and other evidence we have discussed permitted the jury to infer that the Reads' overbilling was intentional.

The Reads further contend that the government did not prove that they intentionally filed fraudulent claims because Priority One EMTs sought to determine in good faith whether patients required ambulance transport. As we have explained, the government offered abundant evidence showing that the Reads devised a fraudulent scheme that they knew involved false representations. *See Phipps*, 595 F.3d at 245–46; *Ratcliff*, 488 F.3d at 643–44.

The Reads incorrectly argue that the government failed to prove that Priority One employees made materially false representations as to Casey's, Lewis's, Pool's, or Hogg's medical condition. Witnesses testified that none of these patients required ambulance transport. For instance, although Lewis suffered from dementia and had previously exhibited violent outbursts, the EMTs who transported her testified that she had never been difficult, and the EMT who vetted her condition did not believe she would become violent. Further, Lewis's physician testified that she was medicated and could have been transported by wheelchair van. Because the Reads instructed EMTs to provide only information that would ensure a claim's payment, and to omit information that would cause payment to be denied, representations that these patients

needed ambulance transport were materially false. *See United States v. Dillman*, 15 F.3d 384, 392–93 (5th Cir. 1994) (representation is "false" if made with reckless indifference to truth or falsity).

Finally, the Reads argue that their convictions must be reversed because Priority One was not required independently to assess each patient's medical necessity for ambulance transport once the patient's physician furnished a CMN. The jury found them guilty, they argue, because transportees' physicians misunderstood Medicare regulations. The Reads ignore that they had doctors sign blank CMNs on many occasions, thus completely removing the doctors from the medical necessity determination. Moreover, assuming, *arguendo*, that the Reads' summation of Medicare regulations is correct, it does not affect the mail fraud convictions. Multiple EMTs, doctors, and nurses testified that the four patients at issue plainly did not qualify for ambulance transport. At the Reads' direction, however, EMTs misrepresented the patients' eligibility to ensure payment. Possession of a CMN—even one that is legitimately obtained—does not permit a provider to seek reimbursement for ambulance runs that are obviously not medically necessary. *See* 42 C.F.R. § 410.40(d)(2) ("Medicare covers *medically necessary* nonemergency, scheduled, repetitive ambulance services if the ambulance provider . . . obtains a [CMN].") (emphasis added).

In sum, because the government offered sufficient evidence to sustain the Reads' convictions, we will not disturb the jury's verdict.

**B.    "Loss" Amount**

The Reads argue that the district court incorrectly determined the "loss" amount for Sentencing Guidelines purposes. They have preserved this claim of error by specifically objecting before being sentenced. *United States v. Neal*, 578 F.3d 270, 272 (5th Cir. 2009). Accordingly, we review the district court's legal interpretation of the Guidelines de novo, and its factual findings for clear error. *United States v. Torres*, 601 F.3d 303, 305 (5th Cir. 2010) (per curiam).

No. 11-40643

Under the Guidelines, the offense level of a defendant convicted of fraud is adjusted according to the amount of "loss" involved in the fraud. U.S.S.G. § 2B1.1(b)(1) (2009). "[L]oss is the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n.3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* "Intended loss" is "the pecuniary harm that was intended to result from the offense." *Id.*

Although the government urged that the loss amount was $7,639,279.74—the full amount billed to the victims—the district court determined this could not be the "intended loss" because the Reads knew that some claims would be rejected. Instead, the district court used the "actual loss" of $1,766,681.31—the amount that Medicare, Medicaid, and BCBS paid on the claims that Priority One submitted. This amount increased the base offense level by sixteen. *Id.* § 2B1.1(b)(1)(I). The Reads contend that the correct loss amount was $93,535.95—the amount of forfeitable proceeds as determined by the jury—which would have increased the offense level by eight. *Id.* § 2B1.1(b)(1)(E). Had the lower adjustment applied, the Reads' advisory sentencing range would have been 37 to 46 months' imprisonment instead of 87 to 108 months.

The Reads ask us to remand for redetermination of the loss amount, arguing that: (1) the district court committed *Booker* error; and (2) the loss amount was not proven by a preponderance. We disagree.

### 1.    *Booker* **Error**

The Reads argue that the district court committed *Booker* error by applying the Guidelines as mandatory instead of advisory, and consequently refusing to consider rebuttal evidence respecting the loss amount. *See United States v. Booker*, 543 U.S. 220 (2005).

The *Booker* argument is based on an exchange between Claudette Read's attorney and the district court at the sentencing hearing:

MR. MAKIN: We feel that the correct amount should be the

No. 11-40643

93,000-dollar amount that the jury found. We disagree with the higher seven-point-whatever million-dollar amount. And I think it's interesting that the new [2011] guidelines that are going into effect deal more with the Reads than the guidelines in effect now. In just a straight reading of the guidelines as they are now, the government is correct. You know, I may not agree with that; but that is the law. But I think that law was aimed at people who had post office boxes and never performed any services or anything. Here --

THE COURT: Well, I'm applying the law that applies now, the law that applied at the time that the defendants -- so, whatever the law may be in the future is really not -- it's interesting, but it's not what I'm going to use today.

The Reads contend that because the district court referred to the Guidelines as "the law," it must have treated them as mandatory. Remarkably, they ignore that the district court referred to the Guidelines as "the law" only in response to Claudette Read's attorney's doing the same. Moreover, nothing in the record establishes that the district court considered the Guidelines mandatory. Indeed, the court expressly stated during the sentencing colloquy that it viewed them as advisory. In context, the reference to "applying the law" is most fairly construed as the court's recognition that it was required correctly to calculate an advisory sentencing range under the Guidelines, and to consider that range when imposing sentence. *See* 18 U.S.C. § 3553(a)(4); *Booker*, 543 U.S. at 245.

The Reads next argue that the district court considered the Guidelines mandatory because it prohibited them from offering evidence to rebut the $1,766,681.31 loss amount. Rebuttal evidence as to an "intended loss" amount is expressly contemplated in the 2011 Guidelines, but not in the 2009 Guidelines under which the Reads were sentenced. *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(viii) (2011). The Reads contend that because they "did real work" to earn most of the $1,766,681.31, they should have been permitted to present evidence showing that the correct loss amount was the amount by which they were overpaid.

14

No. 11-40643

Again, the Reads misrepresent the record. First, the 2011 Guidelines permit a defendant to present rebuttal evidence showing that the total amount *billed* to a government health care program is not the "intended loss"; the rebuttal evidence provision does not apply to "actual loss" or the total amount *paid* on fraudulent claims. *Id.* Under these Guidelines, the Reads thus could have presented evidence showing that the $7,639,279.74 they billed did not reflect the losses they subjectively intended to cause. This was unnecessary, however, because the district court adjusted the offense level based on the amount the victims actually paid. Accordingly, the new provision on which the Reads rely is inapposite.

More significantly, the Reads' argument is meritless because the district court did consider their rebuttal evidence. At the sentencing hearing, the Reads offered the argument they advance now—that they legitimately obtained most of the $1,766,681.31 amount, and thus should be penalized only for the amount overpaid. They further stated that the rebuttal evidence to this effect had been presented at trial. Although they stated that they were willing to present rebuttal testimony, they did not affirmatively seek to do so. At no point did the court prohibit the Reads from presenting evidence or argument. After hearing their arguments, the district court rejected the $93,535.95 figure as "[not] appropriate at all." Because the court considered the Reads' arguments and supporting evidence, their claim of *Booker* error is meritless.

### 2.    Loss Amount

The Reads next argue that the district court incorrectly determined the loss amount. Again, we disagree.

A district court may find by a preponderance all facts relevant to determining the Guidelines sentencing range, including loss amount. *United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009); *United States v. Johnson*, 445 F.3d 793, 797–98 (5th Cir. 2006). Once again, "loss" for sentencing purposes

includes "actual loss"—"the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i) (2009). Because the jury found the Reads guilty of conspiracy, conduct relevant to determining their Guidelines sentencing range included their acts and omissions, as well as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1)(B); *United States v. Torres*, 114 F.3d 520, 527 (5th Cir. 1997); *United States v. McKinney*, 53 F.3d 664, 678 (5th Cir. 1995).

As alleged, the Reads conspired "to obtain reimbursement from the Medicare and Medicaid programs for transporting by ambulance dialysis patients for whom [they] knew reimbursement was not available." The district court determined that the actual loss resulting from the "relevant conduct" was $1,766,681.31—the combined value of the claims paid for transporting the fifteen patients identified in the superseding indictment. This finding was based on a preponderance of the evidence, including testimony by Tina Welch, Joel McQueen, Patricia Cannizzaro, and Marjorie Poche that none of the claims set out in the superseding indictment qualified for payment.

The Reads argue that the district court could not have found the $1,766,681.31 loss amount by a preponderance because the jury found them guilty of mail fraud as to only four patients' ambulance transport claims, whereas the district court's figure was derived from claims related to all fifteen patients at issue. Because the jury did not return a verdict on the mail fraud counts related to the eleven remaining patients, or on any of the health care fraud counts, the Reads contend that the government's evidence did not support the court's loss determination. They ignore that the jury's failure to return a verdict is not equivalent to an affirmative finding of innocence. *See United States v. Price*, 750 F.2d 363, 365 (5th Cir. 1985). The district court was thus not prohibited from finding that the "relevant conduct" related to the conspiracy offense caused an actual loss of $1,766,681.31.

No. 11-40643

Finally, the Reads argue that the total amount paid by the victims was not the correct loss amount because the Reads "did real work" to earn most of that money, and that they should have been penalized only to the extent they were overpaid for non-reimbursable ambulance runs. Once again, the district court did not clearly err in finding that none of the ambulance transports set out in the superseding indictment qualified for reimbursement. Accordingly, it properly held the Reads accountable for the full amount paid by the victims.

## C.    Restitution

The Reads argue that the district court abused its discretion in ordering them to pay $1,766,681.31 in restitution when the jury found that the "gross proceeds traceable to" the offenses of conviction amounted to only $93,535.95. We apply de novo review to a restitution award's legality, and clear-error review to the factual findings underlying the award. *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006); *United States v. Cothran*, 302 F.3d 279, 288 (5th Cir. 2002). If the award is legally permitted, we review it for abuse of discretion. *Cothran*, 302 F.3d at 288.

Under the Mandatory Victims Restitution Act of 1996, a court sentencing a defendant for an offense involving property loss must order the defendant to pay restitution to the victim. 18 U.S.C. § 3663A. "[W]here a fraudulent scheme is an element of the conviction, the court may award restitution for actions pursuant to that scheme." *Cothran*, 302 F.3d at 289 (citation and internal quotations omitted). While restitution represents a victim's loss from the defendant's offense, forfeiture represents the defendant's gain from the offense. *United States v. Taylor*, 582 F.3d 558, 566 (5th Cir. 2009) (citing *United States v. Webber*, 536 F.3d 584, 602–03 (7th Cir. 2008)).

The district court ordered restitution of $1,766,681.31—the combined value of the claims paid in the course of the charged conspiracy. The Reads argue that the district court abused its discretion by ordering restitution in this

amount because the jury's forfeiture determination precluded a finding of loss greater than $93,535.95. We disagree.

The Reads first argue that "the victims' cumulative losses [(the restitution amount)] cannot exceed the 'gross proceeds traceable to the commission of the offenses of conviction' [(the forfeiture amount)]." They fail, however, to provide any apposite authority supporting this argument. They erroneously rely on *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), in which the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* is inapposite because no statutory maximum applies to restitution; the restitution amount is equal to the victims' loss, whatever this may be. *See* 18 U.S.C. § 3663A; *United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003).

To the extent the Reads argue that the restitution amount could not, as a factual matter, exceed the forfeiture amount in this case, and that the district court's restitution finding conflicts with the jury's forfeiture verdict, they provide no apposite authority supporting this argument. They rely on *United States v. Emerson*, 128 F.3d 557 (7th Cir. 1997), in which the Seventh Circuit stated that "paying restitution plus forfeiture at worst forces the offender to disgorge a total amount equal to twice the value of the proceeds of the crime." *Id.* at 567 (citation omitted). The *Emerson* court made this statement in deciding whether ordering restitution in addition to forfeiture disproportionately punishes a defendant. *Emerson* thus does not support the proposition that a district court's factual findings respecting restitution cannot conflict with a jury's forfeiture verdict. *Cf. United States v. Sims*, 144 F.3d 1082, 1084 (7th Cir. 1998) ("Inconsistent RICO convictions and forfeiture verdicts are no more problematic than inconsistent verdicts on substantive offenses."); *United States v. Parker*, 991 F.2d 1493, 1500–01 (9th Cir. 1993) (forfeiture verdict inconsistent with verdict on

underlying count may be sign of jury leniency (citing *United States v. Powell*, 469 U.S. 57, 65 (1984))).

The Reads next argue that ordering restitution in the full amount of the "double transport" payments grants the victims an "unlawful windfall" because these transports would have been reimbursable if billed correctly. This argument is moot because the district court permissibly found that none of the claims for which the Reads were charged was eligible for payment, regardless of single or double transporting. In any event, we are not convinced that the "windfall" argument is correct. *See United States v. Crawley*, 533 F.3d 349, 358–59 (5th Cir. 2008) (corrupt union president must return his full salary even though union would have paid the same amount to an honest president).

The Reads further contend that for restitution purposes, they cannot be held responsible for acts that occurred after the charged conspiracy ended. They base this argument on the erroneous belief that the conspiracy ended in 2004. As charged, and as the trial evidence showed, the conspiracy lasted from 2004 until November 2007. The district court thus properly ordered the Reads to make restitution for claims paid during this period.

Finally, the Reads incorrectly suggest that the restitution order as to BCBS was improper because none of the substantive counts of conviction relates to BCBS. Because the Reads were convicted of conspiracy, and the trial evidence supported the district court's finding that all claims set out in the superseding indictment were fraudulent, the district court properly ordered restitution to BCBS. *See* 18 U.S.C. § 3663A; *Cothran*, 302 F.3d at 289.

D.    **"Position of Trust" Enhancement**

The district court applied a two-level enhancement to the Reads' offense levels pursuant to U.S.S.G. § 3B1.3. This provision applies to a defendant who has "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G.

§ 3B1.3 (2009). The Reads argue that the position of trust enhancement is "unconstitutionally vague, arbitrary, and unenforceable" as applied in this circuit. They further argue that applying this enhancement in the instant circumstances "is overbroad and contrary to public policy." Because the Reads properly preserved this issue, we review the district court's legal conclusions de novo, and its factual findings for clear error. *Torres*, 601 F.3d at 305.

### 1.    Vagueness

Based on the trial evidence, the district court found that Priority One's enrollment in Medicare and Medicaid put the Reads in a position that "significantly facilitated the commission" of their fraud offenses, and that they thus merited the § 3B1.3 position of trust enhancement. Several witnesses had testified that because Medicare and Medicaid do not have the resources to evaluate each of the claims they process—millions each month in Texas alone—these programs' administrators generally assume that the claims providers submit are truthful, and do not verify these claims. Tina Welch testified that the Reads certified they would not knowingly or recklessly submit fraudulent claims to Medicare, and that they understood payment of claims was conditioned on compliance with Medicare laws and regulations. Based on these representations, Medicare gave the Reads substantial discretion to submit claims with minimal supervision.

The district court applied § 3B1.3 in compliance with our clear and long-standing precedent. We have consistently affirmed the position of trust enhancement's application to Medicare and Medicaid providers when sufficient evidence supported a finding that they had substantial discretion to submit claims they knew would likely not be scrutinized. *United States v. Isiwele*, 635 F.3d 196, 205 (5th Cir. 2011); *United States v. Miller*, 607 F.3d 144, 150 (5th Cir. 2010); *United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999); *see also United States v. Iloani*, 143 F.3d 921, 922–23 (5th Cir. 1998) (affirming § 3B1.3's

application to a chiropractor who submitted fraudulent bills to insurance companies). These cases, in turn, are consistent with our broader position of trust jurisprudence: We have held, in accordance with § 3B1.3's application notes, that "[a] position of trust is characterized by (1) professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision"; and that a court considering this enhancement must take into account "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Ollison*, 555 F.3d at 166 (citing U.S.S.G. § 3B1.3 cmt. n.1 (2006); *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993)); *see also id.* at 168 n.12 (collecting cases).

The Reads do not argue that the district court violated our precedent in applying the position of trust enhancement. Rather, they argue that under our precedent, the enhancement is applied so broadly that "literally anyone charged with theft under the federal system will necessarily also have abused a position of private trust." In the Reads' view, the position of trust enhancement should apply only when "recognized legal and fiduciary duties" create the trust relationship contemplated under § 3B1.3, and not in the context of "purely commercial transactions," such as those they purportedly entered into with the victims. In support of this proposed limitation, the Reads rely on *Skilling v. United States*, 130 S. Ct. 2896 (2010). The Supreme Court held in *Skilling* that the federal honest services fraud statute had been applied too broadly and inconsistently. *Id.* at 2929. Because such application might prevent ordinary people from understanding what conduct the statute prohibited, the Court limited honest services prosecutions to the core category of bribery and kickback schemes that Congress had intended to prohibit. *Id.* at 2931.

By challenging our position of trust jurisprudence on vagueness grounds, the Reads obliquely argue that prior panels of this circuit have incorrectly interpreted § 3B1.3. If we held, as the Reads urge, that the position of trust

enhancement is unconstitutionally vague as applied in this circuit, we would have to overturn the binding authority supporting its application in the instant matter. Per our firm rule, even if we were inclined to question that precedent, we can do this only if there has been "an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or by our *en banc* court." *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 663 (5th Cir. 2012) (citation omitted).

The Reads contend that *Skilling* supersedes our jurisprudence respecting the position of trust enhancement as applied to Medicare and Medicaid providers. We disagree. "[F]or a Supreme Court decision to change our Circuit's law, it must be more than merely illuminating with respect to the case before the court and must unequivocally overrule prior precedent." *Id.* The criminal statute addressed in *Skilling* has no material relation to the position of trust Guidelines enhancement at issue here, and we may not use the void for vagueness doctrine to ride roughshod over prior panel decisions merely because the Supreme Court has recently elaborated on that doctrine in a different context. *See United States v. Zuniga-Salinas*, 945 F.2d 1302, 1306–07 (5th Cir. 1991).

### 2.    "Billing Error"

Finally, the Reads argue that the district court erroneously applied § 3B1.3 in the context of a "complicated commercial transaction" in which a billing agent caused a loss equal to a small fraction of the total amount billed. They contend that such application is "overbroad" and would have a "chilling effect." This argument is meritless. As we have discussed, the trial evidence supported the district court's finding that the victims' loss amounted to over $1.7 million. To the extent the Reads suggest that neither of them, but instead a billing agent, was in the position of trust triggering the enhancement, the district court's amply supported factual findings preclude this argument.

### III. CONCLUSION

For the foregoing reasons, the district court's judgment is AFFIRMED.