390 F.2d 125
 PHILADELPHIA ELECTRIC COMPANY
v.
CURTIS BAY TOWING COMPANY OF PENNSYLVANIA and TUGBOAT J. H. DEINLEIN, Her Engines, Tackle, Apparel and Equipment
v.
UNITED STATES of America, Appellee, and American Dredging Company, Curtis Bay Towing Company of Pennsylvania (Claimant-Respondent), Appellant.
Margaret C. WALLING, Ritner E. Walling and Richard C. Walling, Co-Partners trading as Oliver Transportation Company
v.
CURTIS BAY TOWING COMPANY OF PENNSYLVANIA and Tugboat J. H. Deinlein, Her Engines, Tackle, Apparel and Equipment
v.
UNITED STATES of America, Appellee, and American Dredging Company, Curtis Bay Towing Company of Pennsylvania (Claimant-Respondent), Appellant.
 No. 16512.
 No. 16513.
 United States Court of Appeals Third Circuit.
 Argued January 19, 1968.
 Decided February 29, 1968.
 
 Richard W. Palmer, Rawle & Henderson, Philadelphia, Pa., for appellant in both cases.
 Norman G. Knopf, Atty., Civil Division, Appellate Section, Dept. of Justice, Washington, D. C. (Edwin L. Weisl, Jr., Asst. Atty. Gen., Drew J. T. O'Keefe, U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., on the brief) for appellee the United States.
 Before HASTIE, Chief Judge, GANEY, Circuit Judge, and WEINER, District Judge.
 OPINION OF THE COURT
 GANEY, Circuit Judge.
 
 
 1
 The tug J. H. DEINLEIN, operated by the appellant, Curtis Bay Towing Company, on the clear winter morning of December 22nd, 1959, grounded the barge ELECTRIC #20 while towing the barge down the Delaware River in a southerly direction. The owner of the barge, Oliver Transportation Company, and the owner of the cargo of coal carried by it, the Philadelphia Electric Company, each filed a separate libel against the tug and Curtis Bay Towing Company for damage caused by the grounding. In each action Curtis impleaded the United States under the Suits in Admiralty Act, as amended, 74 Stat. 913, 46 U.S.C. § 742, and the American Dredging Company claiming their negligence caused the grounding. Both actions were consolidated for trial without a jury and after a trial lasting some seven weeks, the lower court exonerated the United States and the American Dredging Company from liability, finding that the sole cause of the grounding was the negligence of the appellant, Curtis Bay, and its tug. Curtis Bay Towing has appealed from that portion of the judgment exonerating the United States and finding Curtis solely at fault.
 
 
 2
 The tug DEINLEIN had arranged to tow the barge ELECTRIC #20 from Windy Point down the river to Chester, Pennsylvania, at approximately 10:00 a. m. as the tide was ebbing since it was customary in the towing trade to tow loaded coal barges down the Delaware River at ebb tide. The loading operation was not completed when the tug DEINLEIN arrived and it was therefore necessary for it to wait two hours until the barge was ready to be moved which made the time somewhere in the neighborhood of 12:00 o'clock noon, and as a result of which the water in the river in the vicinity of Windy Point was two feet lower than it had been at 10:00 a. m. The tug was in the charge of Captain Kelly who was an experienced pilot, having towed coal barges from Windy Point to Chester many times and during the six months prior to December 22, 1959, he had towed the loaded barge ELECTRIC down the river to Chester some six times, although on each of these six times, he had begun earlier in the ebb tide than this one.
 
 
 3
 The channel in the middle of the river near Windy Point is 40 feet deep and 1,000 feet wide and staying within this channel a navigator could avoid the hazards lurking in the water immediately outside the channel. One particular hazard here is Horseshoe Shoal which is well-known and located on the Pennsylvania side of the Delaware River downriver from the Windy Point coal pier. As a guide to mariners from going outside the 1,000 foot channel, the United States Coast Guard maintains a system of range lights visible during the day which permits navigators going downriver, by lining up the range lights, to stay in a safe course and, in addition thereto, the Coast Guard maintains buoys to mark the shoal. One buoy, No. 39, was positioned by the Coast Guard approximately 498 feet distant from the Windy Point coal pier and this buoy may be sighted so that a mariner leaving the pier can look down the river (south) and sight the buoy. Captain Kelly, instead of going straight out from Windy Point pier to the middle of the channel and then going south downriver, turned south immediately after leaving Windy Point pier, taking a "short cut" on the hypotenuse of the triangle, in order to reach the center of the channel. In so doing, before he reached the channel he grounded on Horseshoe Shoal causing severe damage to the tug and barge. At the time of the grounding buoy 39 was some 225 feet west of the channel on the Pennsylvania side of the river and thus out of its normal position. Captain Kelly testified he intended to come within some 100 feet of the buoy and that he was guided in his off-channel course by the position of the buoy, relying on it being in its normal position when in fact it was some 225 feet out of its correct chartered position.
 
 
 4
 The sole question involved here is whether the finding of the district court that the negligence of Captain Kelly, in steering the barge in the manner in which he did, was the sole cause of the grounding of the barge and whether this finding by the district court was clearly erroneous in view of the contention of the appellant that the cause of the accident was Captain Kelly's reliance on buoy 39 which he judged to be in its normal position.
 
 
 5
 The court found as a fact, however, that buoys are not to be solely relied on to mark the location of any hazards to navigation, as they frequently drift off their chartered positions and that it was a customary practice of local pilots using the Windy Point pier, before any reliance was placed upon a buoy, that its position be checked by the pilot to determine if it had drifted to shore or away from shore.
 
 
 6
 It was also found that an experienced navigator could look downriver after leaving Windy Point pier and easily see if buoy 39 was in shore or channelward of its chartered position.
 
 
 7
 Additionally, Edward H. Askew, Jr., a former Commander of the Coast Guard cutter ZINNIA, part of whose job it was to keep check on buoys and who was most familiar with this part of the Delaware River, testified that if buoy 39 was, as had been stated, 225 feet off its normal position, it would be "* * * obvious to anyone who knew the river."
 
 
 8
 Furthermore, the court found that Captain Kelly was a first-class Delaware River pilot who had towed numerous barges, some 50 of them since 1954, from Windy Point to Chester, and well knew the hazards ouside the channel, the variations in the depth of the river caused by tides and the proper position of buoys, and from this long experience that he had the responsibility of being able to observe whether a buoy had drifted significantly from its chartered position. It additionally found that the manner in which Captain Kelly towed the barge ELECTRIC on the morning of December 22nd, 1959, demonstrated that he was deficient in his knowledge of the river and in his ability to perform the duties that were his so that the court found that the "navigation of the tug * * * was not that of a navigator exercising reasonable prudence and skill." Kelly chose not to enter the channel but to take the "short cut", despite the fact that there was no traffic in the channel and this could easily be seen as the weather was clear and visibility was unlimited.
 
 
 9
 The position of the appellant is that Captain Kelly relied on the correct position of buoy 39 and since it was the government's responsibility to see that it was properly chartered and in place of it being 225 feet east of its charter position, that the accident was the responsibility of the United States Government through the failure of the United States Coast Guard to have the buoy properly placed.
 
 
 10
 The court's findings of fact were not clearly erroneous in that a careful scrutiny of the record shows that on Captain Kelly's own testimony, he did not solely rely on buoy 39. By his testimony he said that he was steering by Nun-48 (a buoy on the Jersey side) and buoy 39 and by the range lights and the beacons of the range lights and various objects ashore that he was using for navigation, including the oil tanks of Texaco Refining Company at Eagle Point and the dike at Timber Creek.
 
 
 11
 As indicated above, we cannot say that the findings of fact and conclusions of law of the lower court with respect to the long trial which was vigorously contested on both sides were clearly erroneous and, accordingly, the judgment of the district court will be affirmed.