801 F.2d 644
 1987 A.M.C. 257
 Melissa ANDREWS, Administratrix of the Estate of Leo
Andrews, Jr., Melissa Andrews, Administratrix of
the Estate of Edward Andrews and Melissa
Andrews in her own right
v.
UNITED STATES of America and Carl Andrews, personal
representative of the Estate of Laverne Andrews.
Walter J. SMITH, Administrator of the Estate of David Alan Smith
v.
The UNITED STATES of America.
Carl SPIKER, Administrator of the Estate of Carla Marie Spiker
v.
The UNITED STATES of America and Carl Andrews, Personal
representative of the Estate of Laverne Andrews, deceased.
Appeal of Melissa ANDREWS, as Administratrix of the Estate
of Leo Andrews and Edward Andrews, and in her own right;
Carl Spiker, Administrator of the Estate of Carla Spiker;
and Walter Smith, Administrator of the Estate of David Smith.
Carl ANDREWS, Jr., Administrator of the Estate of Laverne
Andrews, Appellant in No. 85-3698
v.
UNITED STATES of America.
Lucille KARNS, Personal Representative of the Estate of
Nancy Karen McCleese, a/k/a Nancy Karen McCleese
Andrews, deceased, Appellant in No. 85-3699,
v.
UNITED STATES of America and Carl Andrews, Personal
Representative of the Estate of Laverne Andrews, Deceased.
 Nos. 85-3678, 85-3698 and 85-3699.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 4, 1986.
Decided Sept. 19, 1986.
 
 Stewart M. Flam (argued), Hunter A. McGeary, Jr., Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for appellants in No. 85-3678.
 Joseph D. Talarico, Pittsburgh, Pa., for appellant in No. 85-3698.
 Joseph P. Moschetta (argued), Washington, Pa., for appellant in No. 85-3699.
 Richard K. Willard, Asst. Atty. Gen., J. Alan Johnson, U.S. Atty., Debra J. Kossow (argued), Senior Admiralty Counsel, U.S. Dept. of Justice, Washington, D.C., for appellee U.S.
 Paul J. Brysh, U.S. Attorney's Office, Pittsburgh, Pa., for appellee in No. 85-3678.
 Daniel J. Weis, Stephen J. Summers (argued), Weis & Weis, Pittsburgh, Pa., for appellee Carl Andrews in No. 85-3699.
 Before SEITZ, ADAMS, and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge.
 
 
 1
 * On June 13, 1981, seven individuals, Leo Andrews, Laverne Andrews, Leo's wife Melissa, Leo's niece Carla Spiker, Laverne's wife Nancy, Leo's son Edward, and David Smith, launched two motorboats into the Ohio River, intending to engage in recreational boating. One boat, owned by Leo Andrews, was fourteen feet in length and had a 35 horsepower outboard engine. The other boat, owned by Laverne Andrews, was sixteen feet long and was equipped with a 50 horsepower outboard motor. At about 2:45 p.m., approximately one and a half hours after being launched, both boats went over the crest of the Dashields Dam and overturned in the water below. Melissa Andrews was the sole survivor.
 
 
 2
 Melissa Andrews and the decedents' estates brought these suits against the United States, which owns the Dashields Lock and Dam. Plaintiffs' primary theory is that the Dashields Dam was a dangerous condition of which the United States failed to give adequate warning. In addition, Melissa Andrews and the estates of Nancy Andrews and Carla Spiker sued the estate of Laverne Andrews for his allegedly negligent operation of his boat.
 
 
 3
 The case was bifurcated. After a three-day bench trial on the question of liability, the court granted judgment for all defendants on the grounds that the United States had not been negligent and that the operators and all passengers were responsible for the tragedy. The plaintiffs have appealed.
 
 
 4
 Jurisdiction over the claims against the government in this case is premised upon the Suits in Admiralty Act, 46 U.S.C. Secs. 741-752, which encompasses all marine torts alleged against the United States. Beeler v. United States, 338 F.2d 687 (3d Cir.1964); see U.S. v. United Continental Tuna Corp., 425 U.S. 164, 176 & n. 14, 96 S.Ct. 1319, 1326 & n. 14, 47 L.Ed.2d 653 (1976). Jurisdiction over the passengers' claims against Laverne Andrews is conferred by 28 U.S.C. Sec. 1333. Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).
 
 
 5
 On appeal, although we have plenary review over the legal question of "the nature and extent of the duty of due care, ... we are bound to sustain the factual findings unless they are clearly erroneous." Redhead v. U.S., 686 F.2d 178, 182 (3d Cir.1982) (citation omitted) cert. denied 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983); see Davidson Steamship Co. v. U.S., 205 U.S. 187, 190-91, 27 S.Ct. 480, 481, 51 L.Ed. 764 (1907); Petition of M & J Tracy, Inc., 422 F.2d 929, 931 (3d Cir.1969); Philadelphia Electric Co. v. Curtis Bay Towing Co., 390 F.2d 125, 127 (3d Cir.1968).
 
 
 6
 Because the district court's conclusion that the United States was not negligent is not clearly erroneous and is in accordance with the applicable legal standards, we will affirm the judgments in its favor on the claims of the operators and the passengers. Because we sustain the district court's conclusion that the operators were negligent, but cannot uphold its conclusion that the passengers were negligent at or immediately prior to the accident, we will vacate the judgment in favor of Laverne Andrews on the passengers' claims and remand those claims to the district court for further proceedings.
 
 II
 
 7
 The following facts were stipulated to by the parties or were found by the district court and are not clearly erroneous. The United States built the Dashields Lock and Dam in the 1920s, and it is currently owned, operated and maintained by The Army Corps of Engineers ("ACOE"). The dam is a "fixed crest dam," and has no superstructure extending above the water.
 
 
 8
 Although the ACOE has employed different warning mechanisms over the years, in 1981 the following devices were in use at the dam.
 
 
 9
 a. A 225 foot long string of fifteen melon floats moored and angled upstream at a 45 degree angle. The floats were 30 inches by 18 inches, white with two orange diamonds on each. In the center of each diamond was a cross.
 
 
 10
 b. A sign, 39 inches by 59 inches on an 8 foot pipe, on which were written the words "Danger Dam" in 10 inch-high white letters on a red background and placed on the left river bank about 700 feet above the dam.
 
 
 11
 c. A sign, located on the right bank about 1000 feet above the dam, "Danger Dam." The sign was 30 inches by 48 inches with 10 inch-high white letters on a red background.
 
 
 12
 d. Three white pillar buoys, each anchored by 400 pounds of concrete, located 280 feet apart and angled in a direction from the end of the melon floats to the sign on the right bank. Each buoy was a standard white regulatory marker with an orange band around the top. Each buoy was 12 inches in diameter and 48 inches high, with two orange diamonds measuring 12 inches by 8 inches. In the center of each diamond was a one inch thick cross and above each diamond were the words "Danger Dam" in three inch-high black letters on a white background. Each buoy stood three feet above the water's surface.
 
 
 13
 e. A sign located on the mooring area of the lock "Arrival Point."
 
 
 14
 The buoy nearest the locks was washed away by a rising river over the weekend of June 6-7, 1981. The melon floats also shifted out of position at that time. At some time before the accident but after May 15, 1981, the 30" X 48"' sign on the right bank disappeared, but without notice or knowledge to the ACOE. At the time of the accident, the 15 melon floats were present, although "bunched up," and the two buoys were present, as were the "Arrival Point" sign and the second "Danger Dam" sign. On June 10, 1981, the ACOE had issued to the general public a notice that the rising waters may have moved warning buoys on the Ohio. This notice cautioned boaters to consult their charts to be sure of their landmarks.[1]
 
 
 15
 Leo and Laverne Andrews ("the operators") were experienced boaters, although plaintiffs insist that they were not familiar with the Ohio River. Plaintiffs assert that the operators had never been on the Ohio River or seen a navigational chart of it, had never seen a fixed crest dam, had never taken a formal course in boating safety, and had no knowledge of the Uniform State Waterway Marking System. However, both operators lived within ten miles of the Ohio River, and they inevitably were aware at least of the publicity issued by the Coast Guard, as well as through newspapers, radio, and television, indicating the onset of the summer boating season and suggesting that the public adequately prepare before embarking on the rivers.
 
 
 16
 The normal depth of the Ohio River at the Dashields Dam is thirteen and one-half feet, but on June 13, 1981, its depth was sixteen and four-tenths feet. The Andrews party launched their boats into the Ohio River approximately one mile upstream from the dam. They motored upriver for a period of time and then changed directions and headed downriver, past the place at which they had launched the boats.
 
 
 17
 As the boats went downstream, they passed by one mariner, Mr. Snyder, who observed that, in his opinion, they were operating their boats in "a poor manner," travelling too quickly and too close to his dock. In fact, he "hollered at them to get away from the dock and slow down." The Andrews party was later observed by another individual, Mr. French, who was fishing just below the dam. He saw the Andrews group approach to within eighteen to twenty-five yards of the crest of the dam and then turn around and head upriver. They travelled about 100 yards before they headed back towards the dam a second time. This time they went over the crest. At the time the boats went over the dam, Melissa Andrews, Carla Spiker, and Nancy Andrews were passengers in Laverne Andrews' boat. Edward Andrews and David Smith were passengers in Leo Andrews' boat.
 
 III
 
 18
 At the heart of plaintiffs' appeal is the proposition that the markings at the Dashields Dam were inadequate. Plaintiffs argue that the district court erred by not holding the United States negligent for its failure to establish and maintain a warning system at the dam sufficient to alert boaters who were unfamiliar with the river and with the uniform symbols used for identifying hazards in the navigable waters of the United States.
 
 
 19
 The district court found that, under the circumstances, the precautions taken by the United States were reasonable. First, the court found that the hazard of the dam was obvious to any person who ventured near it. In particular, it found that the crest of the dam was visible from at least 60 to 75 feet away, a distance ample for evasive action. This finding, although contested by plaintiffs, is not clearly erroneous. Accordingly, this case does not present a question of concealed danger. Second, the trial judge found that the precautions taken were sufficient to warn attentive boaters: "It is my view that the warning signs as existed on June 13th were adequate. They were visible had anyone looked."
 
 
 20
 The district court concluded that the existence of the dam should have been apparent from the "Danger Dam" sign, from the "Arrival Point" sign located by the lock structure, from the appearance of the lock facility and the dam itself, and from the seventeen buoys and floats which were marked with two orange diamonds. In the center of each of the diamonds was a cross. This is a Uniform State Waterway Marking System ("USWMS") symbol that signifies "Caution--Restricted Area--Boats Keep Out."[2] The symbols on the buoys and floats, the lock structure and dam were visible to attentive boaters coming downriver from any position along the river's width. The two signs were visible as well, although the written words may not have been clearly legible at all points across the river.
 
 
 21
 Plaintiffs argue that although boaters may have been able to see the warning symbols, many pleasure boaters would only understand those warnings that were printed in English. Plaintiffs argue that these written warnings were too few and too small to have been seen by boaters in the middle of the river. Therefore, plaintiffs would impose a duty on the United States to provide additional warnings that would be intelligible to boaters who are ignorant of the meaning of the Uniform State Waterway Markings.
 
 
 22
 The Uniform State Waterway Marking System operates as a standardized aspect of the national maritime navigational system.
 
 
 23
 (a) ... [The USWMS] has been developed to provide a means to convey to the small vessel operator, in particular, adequate guidance to indicate safe boating channels by indicating the presence of either natural or artificial obstructions or hazards, marking restricted or controlled areas, and providing directions....
 
 
 24
 (c) The USWMS consists of two categories of aids to navigation.
 
 
 25
 (1) A system of regulatory markers to indicate to a vessel operator the existence of dangerous areas as well as those which are restricted or controlled, such as speed zones and areas dedicated to a particular use, or to provide general information and directions.
 
 
 26
 (2) A system of aids to navigation to supplement the Federal lateral system of buoyage.
 
 33 C.F.R. Sec. 66.10-1 (1980)
 
 27
 33 U.S.C. Sec. 154 (1976), which was in force at the time of the Andrewses' accident, required all vessels on the rivers of the United States to follow the admiralty "Rules of the Road," as contained in 33 U.S.C. Secs. 154 through 232.[3] These rules impose specific duties on river boaters. In addition, the rules recognize the duty to "keep a proper lookout" and to take "any precautions which may be required by the ordinary practice of seamen." 33 U.S.C. Sec. 221 (1976).[4] As the Supreme Court has observed, these "federal Rules of the Road ... apply to all vessels regardless of their commercial or noncommercial nature." Foremost Insurance Co. v. Richardson, 457 U.S. 668, 676 (1982).
 
 
 28
 Given this statutorily-prescribed standard of care, the ACOE was entitled to expect that pleasure craft operators would abide by the ordinary practice of seamen and act in a reasonably prudent fashion. Therefore, it was permissible for them to expect that boaters would understand those uniform symbols commonly utilized by seamen on the nation's navigable waters. Accordingly, we uphold the district court's conclusion that the warning system was reasonable under all the circumstances to warn boaters of the hazards of the dam.
 
 IV
 
 29
 Having found that the United States had taken reasonable precautions to warn boaters of the dam, the district court further concluded that the operators of the boats were guilty of negligence which was a proximate cause of the accident. In addition to supplying alternative support for the judgments in favor of the government, this finding also provides a possible basis for judgments in favor of the passengers on their claims against Laverne Andrews. Accordingly, we must address Laverne's challenge to the district court's finding that he was negligent in failing to learn of the dam through consulting navigational charts, maintaining a lookout, or some other method. We find his challenge unpersuasive.
 
 
 30
 It is conceded that Laverne and Leo had not consulted navigational charts of the Ohio River prior to embarking on their journey. Moreover, it is also conceded that both operators were unfamiliar with the waters on which they were travelling and had not bothered to learn the uniform symbols governing marine navigation. The two operators were thus piloting their boats in wholly unfamiliar waters without the benefit of personal experience, navigational charts, or even the ability to recognize the standard maritime road symbols.
 
 
 31
 In addition, the district court expressly found that both operators had failed to maintain a lookout[5] and this finding is not clearly erroneous. It is supported by the evidence demonstrating that the warning devices were visible and by the fact that both boats went over a dam which the court had found to be visible from a distance of at least sixty feet. An unexplained failure to see what ought to be seen is evidence of a faulty lookout. See, e.g., The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 73, 44 L.Ed. 126 (1899).
 
 
 32
 Under these circumstances, we are constrained to uphold the district court's conclusions that the operators failed to take reasonable precautions for their own safety and the safety of their passengers and that this was a proximate cause of the accident.
 
 V
 
 33
 Although the district court found the operators to have been negligent, it nonetheless denied the passengers' recovery against Laverne Andrews. It did so on two distinct theories: imputed negligence and actual negligence.
 
 
 34
 First, the district court suggested that because it believed that the passengers and their operators were "joint venturers," the operators' negligence was imputed to their passengers. We cannot sustain this ruling. Even if we accepted the court's characterization of the relationship as a joint venture, this would not bar a recovery by an injured joint venturer against a negligent colleague. See e.g. Restatement (Second) of Torts, Sec. 491(2) and comment k (1965).[6]
 
 
 35
 Second, the district court concluded that the passengers were actually negligent:
 
 
 36
 In this case [the rebuttable presumption of due care] ... is rebutted by the evidence that ... [these] deceased persons participated in the reckless and careless operation of each boat as evidenced by the testimony of Snyder and French and also by the fact that each boat was unseaworthy in not having a qualified and competent lookout.
 
 
 37
 It is apparent from the district court's citation to the testimony of Snyder and French that it found the "reckless and careless" behavior to be the operation of the boats at the time of and immediately prior to the accident. Accordingly, to sustain this ruling, we must find some record evidence of the passengers' negligence at the time immediately before they went over the dam as opposed, for example, to negligence at the time they embarked on the outing. Cf. Restatement of Torts (Second) Sec. 466, comment e (1965) (negligence may consist of knowingly entrusting oneself to an incompetent person).
 
 
 38
 While there was ample evidence from which the court could conclude, as it did, that the operators were not paying sufficient attention to where they were going, the record does not suggest that the operators were otherwise operating their boats in an unreasonable manner immediately before the accident, much less that the passengers should be held responsible for the operation of the boats at that point. The only direct evidence of the boats' operation just before the accident which the district court credited was the testimony of French. He testified that immediately prior to the accident the boats were proceeding in open water at three-quarter speed (10 to 15 miles per hour), and were not engaging in any radical maneuvers. He declined to accept the suggestion that they were going too fast or intentionally coming too close to the dam. Rather, French testified that "it didn't seem like they were ... pleasure riding or anything like that. They weren't horse playing or anything like that." While it is true that Snyder testified that earlier in the day the boats had been proceeding too quickly and had come too close to a dock, given French's eyewitness testimony, we conclude that Snyder's testimony cannot support the district court's conclusion.
 
 
 39
 Accordingly, in our view, the judgment on the passengers' claim against Laverne Andrews must be reversed unless we can sustain the district court's finding that the passengers were negligent in failing to maintain a lookout. Since the record will not support that finding, the judgment cannot stand.
 
 
 40
 The parties agree that the failure of a vessel to maintain a lookout is negligence. As with other negligence issues, however, conduct that will satisfy the duty to maintain a proper lookout depends on the surrounding circumstances. Where the vessel involved is the size of the one here and there is nothing to block the operator's vision ahead of the boat, we perceive no basis for holding that someone in addition to the operator must be designated as a lookout. See Complaint of Interstate Transport Co., 717 F.2d 752, 755 (2d Cir.1983); Anthony v. International Paper Co., 289 F.2d 574, 580 (4th Cir.1961). It follows that passengers in such a vessel who are without notice that the operator is being inattentive are no more obliged to maintain a lookout for themselves than are similarly situated passengers in an automobile. See Bastian v. Baltimore & Ohio R. Co., 144 F.2d 120 (3d Cir.1944) (automobile passengers not barred by driver's negligence); Restatement (Second) of Torts Sec. 495 comments c & d (1965).
 
 
 41
 We find no evidence in this record that would support a finding that the passengers either knew or should have realized that Laverne Andrews was not maintaining a proper lookout. Indeed, French's testimony indicates that the operators of the boats were facing directly ahead both during the first downriver pass and immediately before the accident. All this record discloses with respect to the passengers is that those in one of the boats were talking to the passengers in the other boat at the time of the first downriver swing and that apparently no one in either boat saw the dam before the boats plunged over it.
 
 
 42
 We conclude that the claims against Laverne Andrews should be remanded to the district court for reconsideration by the trial judge in light of this opinion. He should review the record to determine whether it shows actual negligence on the part of any passengers and, if so, what the consequences of that negligence should be. In this connection, we note that a finding of negligence on the part of a passenger will not necessarily preclude all recovery since admiralty law embraces the doctrine of comparative negligence. M & O Marine, Inc. v. Marquette Co., 730 F.2d 133, 136 (3d Cir.1984).VI
 
 
 43
 For the foregoing reasons, we will affirm the judgments in favor of the United States, vacate the judgments in favor of Laverne Andrews, and remand the latter for further proceedings consistent with this opinion.[7]
 
 
 
 [1]
 This warning is consistent with 33 C.F.R. Sec. 62.25-55 (1980), which warns "[a]ll mariners ... not to rely solely on buoys for navigational purposes because of their potential unreliability." (Hereinafter all references are to the United States Code and the Code of Federal Regulations as they existed at the time of the accident)
 
 
 [2]
 33 C.F.R. Sec. 66.10-5(c)(1) & (2) (1980), which describes the authorized geometric shapes and the meanings associated with them under the Uniform State Waterway Marking System read:
 (1) A vertical open faced diamond shape ... mean[s] danger.
 (2) A vertical open faced diamond shape having a cross centered in the diamond ... mean[s] that a vessel is excluded from the marked area.
 
 
 [3]
 These rules were revised in 1980, effective December 24, 1981, and can currently be found at 33 U.S.C. Sec. 2001 et seq. (1982)
 
 
 [4]
 33 U.S.C. Sec. 221 (1976):
 Nothing in these rules shall exonerate any vessel ... from the consequences of any neglect ... to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
 
 
 [5]
 The district court concluded that no one on either boat had maintained a lookout. Melissa Andrews testified that she had been directed to look out for debris floating in the swollen waters and that she did this throughout the trip. However, the district court did not credit this testimony
 
 
 [6]
 Restatement (Second) of Torts, Sec. 491(2) (1965) states:
 "Any person engaged in ... a joint enterprise is not barred from recovery against the member of the group who is negligent, but is barred from recovery against any other member of the group."
 
 
 [7]
 Given the views expressed above, we have no occasion to reach the questions of whether the ACOE was on notice of the storm damage or had an opportunity to correct the damage, or whether the doctrine of "discretionary function" immunity insulated the United States from liability for failing to post a lookout at the dam and for not repairing the storm damage prior to the Andrewses' accident. We have considered the appellants' other arguments and find them to be without merit