NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3853
_____

UNITED STATES OF AMERICA

v.

ADVANTAGE MEDICAL TRANSPORT INC;
SERGE SIVCHUK,

Appellants
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania

(District Court Criminal Nos. 1-12-cr-00004-001 and 1-12-cr-00004-002)
District Judge:  Honorable Christopher C. Conner

Argued September 7, 2016

BEFORE:  JORDAN, VANASKIE, and NYGAARD, *Circuit Judges*

(Filed: June 21, 2017)

Mark S. Greenberg, Esq. [Argued]
920 Lenmar Drive
Blue Bell, PA  19422

　　*Counsel for Appellant*

Stephen R. Cerutti, II, Esq. [Argued]
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

　　*Counsel for Appellee*

_____

OPINION[*]

_____

NYGAARD, *Circuit Judge.*

Although there may be no such thing as a free lunch, there is such a thing as a free ride—at least in an ambulance under the Medicare program. That is to say, Medicare Part B covers ambulance transportation for beneficiaries to or from a hospital, nursing home, or medical treatment facility when other methods of transport would put the participant's health at risk. *Nichole Medical Equipment & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 342 n. 2 (3d Cir. 2012) (citation omitted).[1] The costs associated with these transports have increased exponentially: in 2012, Medicare Part B paid $5.8 billion for such transportation, which was almost double the amount it paid in 2003. *See* Department of Health and Human Services, Office of Inspector General, OEI-09-12-00351, *Inappropriate Payments and Questionable Billing For Medicare Part B Ambulance Transports* (September 2015). Available at https://oig.hhs.gov/oei/reports/oei-09-12-00351.pdf. Along with increased costs, ambulance transport claims have long been a vector for fraud and abuse of the Medicare system. *Id*. An investigation by the Department of Health and Human Services Inspector

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] While Medicare additionally covers ambulance transport by helicopter and airplane, our references to ambulance transportation in this opinion are limited to ground transportation.

2

General revealed, for example, that Medicare paid more than $50 million to ambulance companies for improper rides for beneficiaries in the first six months of 2012 alone. *Id.*

The appeal we consider today has its origin in an investigation and prosecution of fraudulent ambulance transport claims in the Harrisburg, Pennsylvania area.[2] The Appellants pleaded guilty to certain fraud charges and do not challenge their plea on appeal. They do, however, raise various challenges to their sentences.

I.

A. The Facts of the Fraud

Appellant Serge Sivchuk was the sole owner and president of Appellant Advantage Medical Transport, Inc. Advantage provided nonemergency ambulance transportation to, among others, qualifying Medicare beneficiaries who needed rides to regularly scheduled dialysis appointments. Medicare approved and authorized Advantage to provide those services and to be reimbursed for them. In August of 2010, Highmark Medical Medicare Services, Medicare's contractor, informed Sivchuk that it was conducting an audit of some of Advantage's claims for reimbursement. Highmark requested that Sivchuk produce supporting documentation for forty ambulance transports that took place in August of 2010 and involved seven different Medicare beneficiaries.

---

[2] Medicare makes every attempt to pay these claims as quickly as possible. *See United States v. Louthian*, 756 F.3d 295, 298 (4th Cir. 2014). When electronically filed, such claims must be paid within fifteen days of receipt, or within twenty-nine days if filed on paper. *Id.* Due to the large volume of claims, however, little or no inquiry is made into their validity when Medicare receives them. *Id.* If a paid claim is later suspected of having been fraudulently submitted, appropriate authorities will initiate investigations, pursue appropriate reimbursement, and instigate criminal charges if warranted—a procedure sometimes referred to as "pay and chase." *Id.*

The supporting documents Highmark wanted to see were "trip sheets," which emergency medical technicians (EMT) prepared while working on a particular run. These reports typically included a narrative section completed by the accompanying EMT in which he or she noted the patient's physical condition, ambulatory abilities at the time of transport, and any other relevant observations and/or concerns. Sivchuk turned the requested trip sheets over to Highmark and Highmark paid these claims a few months later. It was later revealed that fourteen of the forty trip sheets had been fraudulently altered to remove references indicating the patients had been ambulatory when they were transported by ambulance.

In June of 2011, law enforcement officers from the Federal Bureau of Investigation and the Department of Health and Human Services' Inspector General's Office searched Advantage's corporate office. A folder labeled "Rewritten Trip Sheets" was discovered in a cabinet behind Sivchuk's desk. In actuality, the folder did not contain rewritten trip sheets, but the original versions of the trip sheets previously submitted to Highmark. Upon comparison, it became apparent that these original reports contained references to patients being able to walk, stand, or otherwise move on their own and that these references had been omitted from the trip sheets that were submitted to Highmark.

A subsequent grand jury investigation revealed that Sivchuk had ordered some of his employees to instruct the EMTs who wrote the fourteen questionable trip sheets that those reports had been lost and that the EMTs needed to rewrite them. And, when they did so, the EMTs were to omit any references to the patients' ambulatory abilities. Some

4

of these EMTs refused to alter their reports, so Sivchuk had another employee rewrite the trip sheets and forge the objecting EMTs' signatures. In January of 2012, Sivchuk, Advantage, and another Advantage employee, were charged with twenty-nine counts of health care fraud. The indictment alleged that they had billed Medicare for unnecessary ambulance transports for twenty-six dialysis patients from 2007 until 2011. Advantage pleaded guilty to fourteen counts of making false statements in health care matters, in violation of 18 U.S.C. § 1035 and 2. For his part, Sivchuk pleaded guilty to one count of the same offense.

## B. The Sentences

After the Appellants pleaded guilty, the probation office prepared a presentence report (PSR). The PSR pegged Medicare's amount of financial loss at $740,300 for both Advantage and Sivchuk. This amount put Sivchuk's total offense level at 19. His criminal history level was a Category I, which resulted in a guideline range of 30-37 months in prison and a fine ranging from $6,000 to $1,480,620. The range of Advantage's fine was calculated to be between $592,248 and $1,184,496.

Advantage and Sivchuk objected to the calculation of the amount of loss and the District Court held two hearings on this question. After taking testimony from witnesses, physicians, and other experts, the District Court concluded that only the loss attributable to five of the twenty-six beneficiaries would—either in whole or in part—be considered in the loss calculation. We will explore in greater detail how the District Court arrived at this number momentarily. But, based on this determination, the probation office revised the PSRs, and reduced Sivchuk's total offense level to 15. His sentencing range was

5

reduced to 18 to 24 months imprisonment and the range of his fine was recalculated to

between $4,000 and $388,757. Advantage's fine was reduced to a range of $155,502.80

to $311,005.60. The Government also asked for a two level increase in Sivchuk's

offense level based on an "abuse of trust" under § 3B1.3. The District Court agreed to

apply this enhancement, which raised Sivchuk's total offense level to 17 and increased

his guideline range to 24 to 30 months imprisonment. The District Court fined

Advantage $250,000. Sivchuk was sentenced to 24-months imprisonment and fined

$300,000.

II.

Advantage and Sivchuk timely appealed. We have jurisdiction to hear this appeal

pursuant to 28 U.S.C. § 1291. The Appellants argue that the District Court mistakenly

calculated the amount of loss, erred by finding that Sivchuk occupied a "position of

trust," as contemplated by § 3B1.2 of the sentencing guidelines, and that Sivchuk's

sentence was unreasonable. We begin with the arguments questioning the District

Court's loss calculations.

A. The Calculation of Loss for Sentencing Purposes

Under the Guidelines, a defendant's offense level is adjusted according to the

amount of loss involved in a fraud. U.S.S.G. § 2B1.1(b)(1).[3] In reviewing the District

Court's calculation of the loss for sentencing purposes, we are mindful that "[t]he

---

[3] Section 2B1.1 of the Guidelines provides a specific offense-level enhancement based upon the pecuniary loss caused by theft crimes. Where the loss is more than $120,000 but less than $200,000, the base offense level is increased by 10 levels. U.S.S.G. § 2B1.1(b)(1)(F), (b)(1)(G). If the loss is more than $200,000 but less than $400,000, the base offense level is increased by 12 levels. U.S.S.G. § 2B1.1(b)(1)(G), (b)(1)(H).

6

appropriate standard of review of a district court's decision . . . [of] what constitutes 'loss,' is plenary. Factual findings, however, are simply reviewed for clear error." *United States v. Fumo*, 655 F.3d 288, 309 (3d Cir. 2011), as amended (Sept. 15, 2011) (quoting *United States v. Napier*, 273 F.3d 276, 278 (3d Cir. 2001) (internal citation omitted)). In fraud cases, the Government has the burden of establishing the amount of loss for sentencing purposes by a preponderance of the evidence. *Id.* at 310 (citing *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008)). We also recognize the well-settled fact that a sentencing court need only make a "reasonable estimate" of loss based on the available evidence in the record. *See Fumo*, 655 F.3d at 310 (citation omitted).

1.    The District Court's Loss Calculation

The District Court held an initial evidentiary hearing in November of 2013 to determine the amount of loss attributable to Sivchuk and Advantage. An FBI agent testified for the Government and provided the District Court with an overall outline of the investigation. The Government also introduced exhibits which included evidence of altered trip sheets and certificates of medical necessity (CMN), as well as evidence which showed the Appellants' efforts to conceal and control the content of these trip sheets. Evidence relating to the ambulatory abilities of twenty-six beneficiaries was also provided by the Government. Additional testimony was provided by a certified public accountant concerning her analysis of Medicare's payments to Advantage for ambulance transports of these twenty-six beneficiaries between 2008 and 2011. A Medicare fraud investigator also testified to options Medicare could have exercised to stop payment had it learned of the fraud through an audit of Sivchuk and Advantage in 2010.

7

The Appellants presented testimony from an expert witness, Dr. Ralph E. Duncan (Dr. Duncan), a urologist, who testified to the medical necessity of the transports for some of the beneficiaries. Several treating physicians also testified for the defense regarding the necessity of ambulance transports for their individual patients. Testimony by other physicians that ambulance transport may even be necessary where a beneficiary is ambulatory was also presented. Several physicians who were unable to attend the hearing provided affidavits which related their positions that ambulance transportation was necessary for their patients.

Given this range of testimony, the District Court asked the parties to file supplementary briefing outlining their positions on the amount of loss. Not surprisingly, their positions were as different as could be. The Government maintained that Medicare's loss amounted to $1,821,661 for ambulance runs for twenty-six beneficiaries between the years 2007 to 2011. Advantage and Sivchuk, on the other hand, argued that any amount of loss should only be calculated from the fourteen trip sheets they admitted to altering. This would have amounted to a loss of $2,712.17 and no corresponding increase in their base offense levels. *See* U.S.S.G. § 2B1.1(b)(1)(A).[4]

The District Court winnowed the number of beneficiaries it would ultimately rely on to calculate the amount of loss. First, the District Court found that the Government had established a *prima facie* case for a loss amount of $1,821,661 based on twenty-six

_____

[4] The District Court incorrectly referred to an amount of $2939.27 in its first opinion on the calculation of loss, but referred to the correct amount of $2,712.17 in its final sentencing memorandum.

beneficiaries.[5] The Appellants then produced evidence rebutting fifteen of these twenty-six beneficiaries. Of these fifteen, the District Court ruled that the Appellants had refuted the Government's loss claims for twelve of them. The Appellants did not present evidence of medical necessity for the remaining eleven beneficiaries. So, the District Court concluded that the Appellants were responsible for a loss amount of $986,201.50. This number was arrived at by adding $820,835 for transports for eleven unchallenged beneficiaries, and $147,366.50 for half the costs associated with transporting three other beneficiaries. These three beneficiaries were Doris B., Sandra Bo., and James R.[6]

Advantage and Sivchuk then moved for a continuance so they could produce medical records for the eleven beneficiaries that went unchallenged at the prior hearing. The District Court granted their request, issued subpoenas *duces tecum*, and held a second evidentiary hearing at which the Appellants presented extensive evidence including medical records for the eleven beneficiaries, affidavits from their treating physicians, and the expert testimony of Dr. Duncan, who again testified to the medical necessity of transporting these eleven beneficiaries via ambulance. After this hearing, the District Court concluded that ambulance transportation was appropriate for nine of the eleven beneficiaries, but that half of the transports for two beneficiaries—David T., and Michael M.—should be included in the calculation of loss.

---

[5] "In health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss for sentencing purposes." U.S.S.G. § 2B1.1 cmt. n.3(F)(viii).

[6] The District Court referred to all the beneficiaries by abbreviated designations throughout its opinions to protect their privacy and we will do the same.

In the aggregate then, the District Court concluded that transportation costs for five of twenty-six Medicare beneficiaries were not medically necessary and based the amount of loss suffered by the Medicare program on the costs associated with transporting those five beneficiaries. This put the total amount of loss charged against Advantage and Sivchuk at $194,378.50. On appeal, one of the Appellants' arguments is that, under the regulations in effect at the time, the transport of three of the five beneficiaries was medically necessary and, therefore, the costs associated with those transports should not have been included in the District Court's calculation.

2.      The Regulation on Ambulance Transportation and Medical Certification

We agree that the District Court should have excluded those three beneficiaries from its loss calculation because their transports satisfied the regulation in effect at the time they occurred. We recognize that when interpreting agency regulations we do not write on a blank slate, and that an agency's interpretation of its own regulations is usually entitled to some degree of deference. *See, e.g., Fair Housing Rights Center in Southeastern Pennsylvania v. Post Goldtex GP, LLC*, 823 F.3d 209, 217 (3d Cir 2016); *AT&T Corp. v. Core Communications, Inc.*, 806 F.3d 715, 725 (3d Cir. 2015). But, "in the same vein, an agency's interpretation of its own regulations is not entitled to substantial deference by a reviewing court where 'an alternative reading is compelled by the regulation's plain meaning or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Mercy Catholic Medical Center v. Thompson*, 380 F.3d 142, 152-53 (3d Cir. 2004) (quoting *Thomas Jefferson Univ. Hosp. v. Shalala*, 512 U.S. 504, 512 (1994). That is, when reviewing an agency's interpretation of its own

10

regulation, "we grant less deference than otherwise." *Sekula v. F.D.I.C.,* 39 F.3d 448, 453 (3d Cir. 1994). Since Medicare covers ambulance services "only to the extent provided in regulations," we will begin there. *See* 42 U.S.C. § 1395x(s)(7).

The relevant regulation in this case, 42 C.F.R. § 410.40, begins with a "basic rule" that the ambulance "service meets the medical necessity . . . requirement of paragraph [](d)." 42 C.F.R. § 410.40(a). Paragraph (d), for its part, sets out a "general rule" and a "special rule" for the medical necessity rule requirement. The "general rule" provides:

> Medicare covers ambulance services, including fixed wing and rotary wing ambulance services, only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated. The beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary. Nonemergency transportation by ambulance is appropriate if either: the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required. Thus, bed confinement is not the sole criterion in determining the medical necessity of ambulance transportation. It is one factor that is considered in medical necessity determinations. For a beneficiary to be considered bed-confined, the following criteria must be met:
>
> > (i) The beneficiary is unable to get up from bed without assistance.
> > (ii) The beneficiary is unable to ambulate.
> > (iii) The beneficiary is unable to sit in a chair or wheelchair.

42 C.F.R. § 410.40(d)(1)(i-iii). The regulations also set out a "special rule" for "nonemergency, scheduled, repetitive ambulance services," like those at issue here. 42

11

C.F.R. §410(d)(2). Under this section, "Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met. The physician's order must be dated no earlier than 60 days before the date the service is furnished." *Id.* Thus, under this version of the regulation, Medicare would cover the costs of ambulance transportation if five conditions were met: the transportation was (1) medically necessary , (2) nonemergency in nature, (3) scheduled, (4) repetitive, and (5) a written certification of medical necessity, signed by a physician, indicating transportation was medically necessary. *Id.* The three transports Appellants urge us to look at here were not emergencies, were scheduled, and were repetitive. Physician certificates of medical necessity were also provided for each patient. So, the question we are left with is whether these transports were medically necessary at the time they took place. Appellants maintain that beneficiaries Doris B., Sandra Bo., and James T. met the regulation's requirements and were medically necessary. We agree because the plain language of the regulation, as written at the time Advantage transported these beneficiaries, required nothing more than a physician's certification that the transport was medically necessary. Advantage did not have to second guess these certifications as long as they were legally obtained.

At the time these transports took place, the regulation did not say that a physician's certification was insufficient in and of itself to establish medical necessity. Nor did the regulation state that the ambulance provider must demonstrate that other

12

means of transportation would place the beneficiary's health in jeopardy. Instead, the regulation can be plainly read to say that, where the transportation service was scheduled, repetitive, and the doctor's certification addressed the beneficiary's medical need for such transport, further inquiry was not called for. Therefore, at the time the Appellants transported beneficiaries Sandra Bo., David T., and Michael M., the regulation's requirements were met and there was no loss to the Medicare program.

Sandra Bo., for example, was treated for renal failure from 2007 to 2010. Her physician, Dr. Mohamed Elnour, wrote to her insurance carrier in December of 2009, indicating that it was medically necessary for her to be transported to dialysis treatment by ambulance because "one of her legs [had been] amputated." App. at 241, 242, 245. Dr. Elnour again notified Sandra's insurance company that transporting her to dialysis via ambulance was a medical necessity in January of 2010. Advantage began transporting Sandra on March 6, 2010, which was within the appropriate time-frame set by the regulation.

Beneficiary David T.'s physician, Allison Bell, also signed a certificate of medical necessity for her patient on September 5, 2010 and again on October 22, 2010. App. at 278. Dr. Bell's affidavit in the District Court indicated that David suffered from chronic edema in his lower extremities, as well as from congestive heart failure. App. at 278-79. Dr. Bell also reported that this beneficiary was morbidly obese and suffered from shortness of breath. *Id*. Certificates of medical necessity were likewise submitted for beneficiary Michael M. by his treating physician, Julie Rothman. Dr. Rothman certified that Michael needed ambulance transportation to dialysis appointments on account of his

13

"end stage renal failure," because he was "an extraordinarily large man," who "could not ambulate independently." App. at 229. All of these beneficiaries satisfied the requirements of the regulation in existence at the time of their transports because all that was required of them under the regulation was a certificate of medical necessity from their attending physician.

Of course, the regulation in effect today is different from the regulation that was in effect during the time of the transports here. But, we are nonetheless bound to consider the regulation that was in place at the time of the transports in dispute. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, Congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Andrews v. United States*, 801 F.2d 644, 647 n.1 (3d Cir. 1986) (applying regulations in existence at the time of the accident in question). The Department must have recognized that its regulation was being read to only require a certificate of medical need from a physician to qualify for reimbursement. We say 'recognized' because the Department acknowledged, through its later amendment to the rule, that the regulation was not being interpreted in the manner they intended. Effective January 1, 2013, subsection (d)(2) was altered to include the following language:

> (ii) In all cases, the provider or supplier must keep appropriate documentation on file and, upon request, present it to the contractor. *The presence of a signed physician certification statement does not alone demonstrate that the ambulance transport was medically necessary.* All other program criteria must be met in order for payment to be made.

14

42 C.F.R. § 410.40(d)(2)(ii) (Effective January 1, 2013) (emphasis added). This new language was based on language found in a similar provision of another regulation, 42 C.F. R. § 410.40(d)(3)(v), which covered unscheduled and nonrepetitive ambulance services:

> In all cases, the provider or supplier must keep appropriate documentation on file and, upon request, present it to the contractor. The presence of the signed certification statement or signed return receipt does not alone demonstrate that the ambulance transport was medically necessary. All other program criteria must be met in order for payment to be made.

In proposing this change to the rule, the Department's Centers for Medicare and Medicaid Services noted that, despite what it believed to be the clarity of its regulation,

> ". . . some courts have recently concluded that § 410.40(d)(2) establishes that a sufficiently detailed and timely order from a beneficiary's physician, to the exclusion of any other conclusively demonstrates medical necessity with respect to nonemergency, scheduled, repetitive ambulance services."

77 Fed. Reg. 4480 (2012). The Department understood that their regulation needed clarification and expressly stated that the change was necessary "to clarify that a physician certification statement does not, in and of itself, demonstrate that a nonemergency, scheduled, repetitive ambulance service is medically necessary for Medicare coverage." *Id.* The problem, as we see it, is that while the Department may have intended for the language of another regulation to apply to nonemergency ambulance transports, it did not make that intention clear until well after the transports at issue in this case took place. This lack of clarity should not be held against the

15

Appellants; it is almost as if the Department moved the goalposts for compliance with the regulation.

Valid, time-appropriate certificates of medical necessity from physicians were on file for each of these three beneficiaries. Under the regulation in effect at the time and as interpreted by at least two district courts, that was all that was needed to make these transports medically necessary. *See First Call Ambulance Servs. Inc. v. Dep't of Health & Human Servs.*, 2012 WL 769617 (M.D. Tenn. March 8, 2012); *Moorecare Ambulance Serv. v. Dep't of Health & Human Servs.*, 2011 WL 839502 (M.D. Tenn. March 4, 2011).

The Government does not agree. First, it argues that the regulation does not "simply require" a physician to certify medical necessity, but that there also must "be" a medical necessity. Gov. Br. at 32. This is circular reasoning. Under the applicable version of the regulation, if a beneficiary's treating physician certifies ambulance transport is medically necessary, isn't it?

Next, the Government points to the Court of Appeals for the Fifth Circuit's decision in *United States v. Read*, 710 F.3d 219, 228 (5th Cir. 2012) as support for its position that the transports for these three beneficiaries should be included in the loss calculation. While the *Read* decision is persuasive on the issue of Sivchuk's sentencing enhancement, which we will discuss *infra*., we do not find it persuasive on the calculation of loss question. Like here, the defendants in *Read* were convicted of health care fraud for billing Medicare for ambulance transports of dialysis patients. But, the similarities end there. First, physicians in *Read* testified that the transports under review were not medically necessary; here the physicians testified that they were. Second, the ambulance

16

company owners had the doctors pre-signed blank certificates, which the owners and employees fraudulently filled-in at a later date. In other words, in *Read*, physicians were completely removed from the medical necessity determination. By contrast, the treating physicians of the three beneficiaries whose transports were included in the loss amount here all testified that there was a present medical necessity which required that those beneficiaries be transported by ambulance. Given all of this, we will vacate Sivchuk's sentence and remand to the District Court for it to recalculate Medicare's loss, and to make the necessary adjustments to Sivchuk's sentence.

### B.      The Abuse of Trust Enhancement

There is no need, however, for the District Court to reconsider its application of the position of trust enhancement to Sivchuk's sentence on remand. It was applied correctly. Such an enhancement is applicable where a defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3  Put another way, the guidelines permit a two-level upward adjustment in the offense level where the sentencing court finds that the defendant (1) occupied a position of public or private trust and (2) abused that position in a manner that significantly facilitated the commission or concealment of an offense. *United States v. Babaria*, 775 F.3d 593, 596 (3d Cir. 2014). Sivchuk argues that he did not occupy a position of trust and, if he had, he did not abuse such a position. We disagree.

Sivchuk first contends his position as the executive of an ambulance transport company (which was authorized to submit claims to Medicare) did not put him in a

17

position of private trust in relation to the program.[7]  Although we have upheld the application of the abuse of trust enhancement to health care fraud cases involving physicians and medical managers and directors, *see e.g., id.* at 595-98, we have not yet addressed the applicability of the enhancement to those in the ambulance business, like Sivchuk, until today.

Our initial inquiry is whether Sivchuk occupied a position of trust.  *Id.* at 596.  Such as position, according the guideline's commentary, is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)," and "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature."  U.S.S.G. § 3B1.3 cmt. n.1.  We have identified three factors to consider when determining the existence of a trust relationship: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-à-vis the object of the wrongful act; and (3) whether there has been a reliance on the integrity of the person occupying the position."  *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994).

The record here supports the conclusion that Sivchuk occupied a position of trust.  As to the first factor, Sivchuk's position as president, manager, and sole shareholder of Advantage made his fraudulent activity difficult to detect.  He had sole control of the company's finances and record keeping, which allowed him to conceal his fraudulent

---

[7] We exercise *de novo* review over "the question whether a position is one of trust," while "we review for clear error whether a defendant abused that position."  *United States v. Sherman*, 160 F.3d 967, 969 (3d Cir. 1998).

18

activities from others.  Second, Medicare expressly authorized Sivchuk to submit claims for reimbursement, which was indispensable to the successful commission of his fraud. And third, Medicare relied on Sivchuk's integrity not only in authorizing him to submit reimbursement claims for his company, but also in accepting the accuracy of the reports and records he submitted in response to the audit.  We conclude, as did the District Court, that Sivchuk occupied a position of private trust.  We also conclude that Sivchuk abused that position to commit and conceal his fraud.  *Barbaria*, 775 F.3d at 596.  Given his position of trust, Medicare did not subject Sivchuk to regular supervision or oversight. His position allowed Sivchuk to submit fraudulent Medicare claims without detection, as well as gave him free reign to order his employees to fabricate company trip sheets so as to conceal the ambulatory abilities of Medicare beneficiaries.

Generally speaking, the application of this enhancement is not uncommon in cases of health care fraud.[8]  We have affirmed its application in such cases.  For example, in

---

[8] Indeed, courts have routinely applied this enhancement in a wide variety of health care providers who submitted false claims to Medicare, Medicaid, or private insurance providers.  *See, e.g., United States v. Miller*, 607 F.3d 144 (5th Cir. 2010) (durable medical equipment provider's false claims to Medicare for power wheelchairs and scooters); *United States v. Iloani*, 143 F.3d 921, 922-23 (5th Cir. 1998) (chiropractor submitted false bills to insurance company); *United States v. Rutgard*, 116 F. 3d 1270, 1293 (9th Cir. 1997) (false ophthalmologist claims to Medicare); *United States v. Bolden*, 325 F.3d 471, 504-05 (4th Cir. 2003) (nursing home operator who perpetrated fraud against Medicaid); *United States v. Willet*, 751 F.3d 335, 338 (5th Cir. 2014) (affirming district court's application of abuse of trust enhancement where defendant was a medical equipment supplied and "upcoded" and billed Medicare for more expensive items than defendant actually provided); *United States v. Njoku*, 737 F.3d 55, 61-62 (5th Cir. 2013) (affirming application of two level enhancement where a home health care company billed Medicare for ineligible patients after nurses signed questionnaires without first examining the patient); *United States v. Valdez*, 726 F.3d 684, 687-89, 694 (5th Cir. 2013) (affirming application of enhancement where defendant operated a pain

*United States v. Sherman*, we upheld the application of this enhancement to the sentence imposed on a physician who fraudulently billed insurance companies for phantom office visits and equipment. 160 F.3d at 970; *see also Barbaria*, 775 F.3d at 597. And, our determination that Sivchuk, an ambulance company executive, occupied a position of trust for sentencing purposes is not without precedent. For example, in *Read*, *supra*., the Fifth Circuit approved the use of this enhancement against owners of an ambulance service who had submitted fraudulent claims to Medicare and Medicaid for transporting beneficiaries to dialysis treatment. 710 F.3d at 233. In upholding the enhancement, the Court of Appeals noted that it had always affirmed the application of the enhancement "when sufficient evidence supported a finding that [the defendant] had substantial discretion to submit claims they knew would likely not be scrutinized." *Id.* Also, in *United States v. Gieger*, the Fifth Circuit upheld the application of this enhancement to the sentences of ambulance company executives who submitted false records to Medicare because they held a position of trust with medical insurers that was similar to that of a chiropractor who had likewise submitted fraudulent claims to the program. 190 F.3d 661, 665 (5th Cir. 1999) (citing *United States v. Iloani*, 142 F.3d 921, 922-23 (5th Cir. 1998).[9] Sivchuk was in the very same position of trust as the ambulance executives in *Read* and *Gieger*. As an authorized provider of services, Medicare relied on Sivchuk's honesty and

management clinic and billed Medicare for more expensive visits and procedures than were actually performed).

[9] The Court of Appeals for the Fourth Circuit has reached the same conclusion, albeit in a nonprecedential opinion. *See United States v. Connor*, 262 Fed. Appx. 515, 518 (4th Cir. 2008) ("Indeed, we see it as paramount that Medicaid be able to 'trust' its service providers," quoting *United States v. Bolden*, 325 F.3d 471, 505 (4th Cir. 2003)).

integrity to only submit claims for truly needed ambulance transportation. Instead, Sivchuk exploited the unique position of trust that Medicare gave him, all the while knowing that claims Advantage electronically submitted to Medicare were not going to be scrutinized before they were paid.

Sivchuk raises several arguments against the application of this enhancement, none of which we find compelling. First, Sivchuk maintains that Medicare could not have placed any degree of trust in him because the program has fraud detection programs and methods at its disposal and that these tools were actually used in his case. The existence of these fraud detection tools, however, does not undermine the position of trust the Medicare program afforded Sivchuk. The Medicare program does not have the available resources to use its fraud detection programs on every claim submitted. *See Read*, 710 F.3d at 233. Because a large part of Medicare claims go unverified, some degree of trust will be necessarily placed in reimbursable providers. Further, the fact that Medicare did ultimately use its fraud detection program does not convince us that the application of the enhancement was improper. One does not negate the other. That is, the use of Medicare's detection methods to identify fraudulent activity does not mean that the program never imbued its providers with a level of trust. And, we agree with the Government here, that to accept such an argument would render the enhancement inapplicable when an offender is caught through the use of program's fraud detection tools, yet leave the enhancement applicable to those frauds that were discovered through other means.

21

Sivchuk also tells us that since his position was different from that of a physician, the enhancement is inapplicable. Not so. We find no basis in statute, regulation, or caselaw which would tether some professional degree, licensure, or training to the proper application of the enhancement. Whether or not Sivchuk was a physician is quite irrelevant to the determination whether he fraudulently billed Medicare and was in a position to conceal his fraud because of his managerial position in the company.

To the extent Sivchuk argues against the application of the enhancement because doing so would open floodgates for applying the enhancement to every government service provider because they utilize online billing, we disagree. Sivchuk ignores all of the elements associated with the enhancement, which the Government must prove before asking for such an enhancement. These elements require evidence far and beyond the fact that a particular defendant was a government service provider. Sivchuk's position also ignores the existence of precedent from other circuits which have approved of the enhancement for Medicare ambulance providers without an ensuing avalanche of enhancements to the sentences of defendants based on the sole fact that they were government service providers.

We, therefore, find no error in the application of the § 3B1.3 position of trust enhancement to Sivchuk's sentence. The application of this enhancement was wholly consistent with precedent—ours as well as that of other courts. The application of this enhancement to Sivchuk's sentence is affirmed.

C.     The Reasonableness of the Sentences and Fines

22

Because we will vacate Sivchuk's sentence and remand for a recalculation of the actual losses suffered by Medicare, we cannot opine on the reasonableness of the sentence and fines at this juncture.

### III.

The regulation in place at the time of the transports for beneficiaries Doris B., Sandra Bo., and James R. required nothing more than a doctor's certification that the patient had a medical need to be transported via ambulance, we will vacate the sentence and we remand for a recalculation of the amount of loss, excluding those three beneficiaries. We find no error, however, with the District Court's enhancement of Sivchuk's sentence for violating a position of trust.

*USA v. Advantage Medical Transport,* No. 15-3853
JORDAN, *Circuit Judge,* dissenting

I join my colleagues' thoughtful analysis in this case in all but one important respect. I do not agree with them that, under the version of the regulation in force at the time of the crimes, a doctor's certification of medical necessity ("CMN") definitively established that an ambulance ride was medically necessary. Under the pertinent regulation, 42 C.F.R. § 410.40(d)(2), five separate conditions were, without elaboration, set forth as necessary to demonstrate that ambulance rides of the sort at issue here were reimbursable by Medicare. As accurately set forth in the Majority Opinion, those five were that the transportation was (1) medically necessary, (2) nonemergency in nature, (3) scheduled, (4) repetitive, and (5) justified by a CMN. My colleagues in the Majority treat the first and fifth conditions as redundant. I do not believe that they are. There was a reason why ambulance drivers were (and still are) required to fill out "run sheets" describing the condition of the patients. Their observations matter.

While it may well have been that, in ordinary cases, a physician's certification was enough to satisfy both the first and fifth conditions, there could have been cases in which an ambulance driver on the scene, dealing regularly with a patient, would apprehend a reason why transportation by ambulance was not medically necessary. I thus agree with the District Court's analysis and with the following observation of the United States Court of Appeals for the Sixth Circuit in a case similar to ours:

> [I]t is a cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute. The regulations provide that "Medicare covers *medically necessary* nonemergency, scheduled, repetitive ambulance services if the ambulance provider ... obtains a [CMN]." 42 C.F.R. § 410.40(d)(2) (emphasis added). In other words, Medicare covers "nonemergency, scheduled, repetitive ambulance services" only if both (1) those services are medically necessary and also (2) the ambulance provider obtains a CMN. On the [defendants'] theory, obtaining a CMN demonstrates medical necessity. But if a CMN was all that was required to determine medical necessity, then the part of the regulation that required run sheets would be redundant. We choose to give effect to every word of the regulation.

*United States v. Medlock*, 792 F.3d 700, 709 (6th Cir. 2015) (internal quotation marks and citation omitted).

I would affirm the District Court's judgment of sentence in all respects, as it reflects a thorough and sound analysis. Seeing no reason to vacate and remand, I respectfully dissent.

1